UNITED STATES of America, Plaintif-Appellee,

v.

Biagio CIRRINCIONE and Tom Cirrincione, Defendants-Appellants.

Nos. 84–2812, 84–2813.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1985.

Decided Dec. 11, 1985.

As Amended Dec. 12, 1985.

Rehearing Denied Jan. 17, 1986.

622

David S. Mejia, Office of Patrick A. Tuite, Ltd., Maren Dougherty, Genson & Steinbeck, Chicago, Ill., for defendants-appellants.

James D. O'Connell, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, FLAUM, Circuit Judge, and CAMPBELL, Senior District Judge.[*]

FLAUM, Circuit Judge.

Appellants Biagio and Tom Cirrincione appeal their convictions for conspiring to bomb several of a competitor's restaurants. The Cirrinciones raise five issues on appeal: (1) whether the two defendants knowingly and voluntarily waived their right to separate counsel; (2) whether an actual conflict of interest existed that deprived the two co-defendants of their sixth amendment right to effective assistance of counsel; (3) whether the trial court erred in denying the defendants' motion for severance; (4) whether Biagio was denied his procedural due process rights by the absence of an interpreter at all pre-trial proceedings and at trial; and (5) whether the defendants should receive a new trial because of the prejudice from alleged hearsay that was admitted into their trial.

We affirm the district court on all five issues and hold all errors harmless.

## I.

### Facts

In 1969, Rocco Palese came to the United States from Italy with his family. The Palese family owned and operated a series of Italian restaurants, including a string of pizza parlors named "Nancy's Restaurant" in honor of Rocco Palese's wife. The Nancy's Restaurants specialized in stuffed pizza that was made from a "secret recipe" developed by Rocco Palese. The first Nancy's opened in 1974 on Lawrence Avenue in the Harwood Heights neighborhood of Chicago. The Palese family intended to franchise a chain of Nancy's pizza parlors and in 1977 began plans to open a second Nancy's on Central Avenue.

Defendant Biagio Cirrincione came to the United States from Italy in 1966, bringing with him his wife Josephine and several children, including his son, defendant Tom Cirrincione, who was born in Italy in 1959. The Cirrinciones also owned and operated a series of Italian restaurants in Chicago and in November 1977 agreed to purchase the Lawrence Avenue Nancy's pizza parlor from the Paleses. The agreement of sale provided that the Paleses would give the Cirrinciones the secret recipe for Rocco's stuffed pizza. Before the Cirrinciones were given the recipe, Biagio Cirrincione allegedly warned Rocco Palese, "If you do not give me the right recipe, gasoline is cheap. Only costs a dollar."

Two years later the Cirrinciones bought another Nancy's pizza parlor from the Paleses, this one on Central Avenue. The contract of sale included a covenant by the Palese family not to compete within a ten-mile radius, with the exception of the third Nancy's recently opened by the Paleses on Golf Road, and the area east of Clark Street. Within the year Biagio Cirrincione complained to Rocco Palese's daughter, Marisa, that the Golf Road Nancy's was too close to the two Nancy's that Cirrincione owned. On Halloween night, 1980, the Golf Road Nancy's exploded into flames. The restaurant's back window had been broken and two gallons of gas had been thrown into the kitchen. The Golf Road Nancy's was severely damaged and did not reopen until 1982.

The Paleses opened a Nancy's on Broadway in June of 1981 and several months later the Cirrinciones and the Paleses entered into negotiations for the sale of the "Nancy's" name. Biagio Cirrincione allegedly agreed orally to pay Rocco Palese a

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

total of $50,000 for the use of the name. However, it was agreed that Biagio would pay $25,000 openly and the other $25,000 "under the table." The two families met at the Lawrence Avenue Nancy's to sign the contract, but when Biagio refused to pay the second under-the-table payment, Rocco tore up the contract. Immediately after this meeting Biagio's wife Josephine allegedly offered $2,500 to an employee named Steven Pace to shoot Rocco's son Ted. Biagio calmed his wife down but then allegedly suggested framing Ted by planting drugs on him, a plan that was also later dropped.

Several months later Steven Pace told Tom Cirrincione that Pace and Biagio Cirrincione's son-in-law, Ned Siegel, were the ones who had bombed the Golf Road Nancy's. In late fall, 1981, at Tom Cirrincione's request, Pace met with Tom and Biagio. Biagio allegedly offered Pace a total of $15,000 to bomb the rebuilt Golf Road Nancy's, the Broadway Nancy's, and the Paleses' home. Pace then obtained dynamite in Kentucky. Early New Year's day morning, Pace placed a time-bomb in the Golf Road Nancy's which went off that evening, destroying the entire rear wall of the restaurant. A week later a molotov cocktail was thrown into the Broadway Nancy's. The restaurant, and the adjoining businesses, were severely damaged. In May 1982 Pace was arrested for his participation in the bombings. Nearly two years later Pace agreed to testify against Biagio and Tom Cirrincione.

The facts underlying the conflict of interest claim arose when, before trial, Biagio Cirrincione was interviewed by an Assistant United States Attorney. In that interview he denied ever knowing or employing Steven Pace, and denied any involvement in the bombings. Tom Cirrincione was subpoenaed to appear before a grand jury investigating the bombings. Tom testified that every member of his family knew Pace, that he and his father employed Pace, and that Pace had visited Biagio Cirrincione's home on Christmas day 1981, the day Pace claimed to have shown Biagio and Tom the dynamite that he and a friend,

Lester Lewis, were going to use to bomb the Golf Road Nancy's at Biagio's request. These contradictory statements were not revealed to the district court judge at the pretrial hearing held to determine whether Biagio and Tom could be represented by the same attorney.

At the hearing before the district court, Biagio and Tom stated that they wished to waive their right to separate counsel. The Cirrinciones' attorney stated, when asked whether he could ethically represent these two defendants, "In my opinion, your Honor, both are charged with the same offenses, they pled not guilty, they have a common defense, no antagonistic defenses, no possibility of conflict, no clear potential for conflict whatsoever." Conversely, the prosecutor stated: "Judge, I think there is enormous potential for conflict ... their culpability even as alleged is somewhat different ... you can view it as totem-pole crime, Mr. Biagio Cirrincione was really on the top, the second level being his son, our evidence will be disparate with respect to the two defendants also." Now, in a reversal of their trial position, Biagio and Tom Cirrincione claim that because of the nature of their familial relationship, their misconception of the government's interest in their having separate counsel, and Biagio's inability to fully understand English, they did not knowingly and voluntarily waive their right to separate counsel. The Cirrinciones argue alternatively that if they did waive their right to separate counsel, this court nevertheless should grant them new and separate trials because of the actual conflict their attorney faced at trial. The government now argues that the Cirrinciones did knowingly waive their right to separate counsel and that while the potential for conflict may have been great, there was no actual conflict of interest during the trial.

After the trial, Biagio was convicted of three counts and sentenced to six years, and Tom was convicted of one count and sentenced to two years, of "conspiring to damage property not belonging to defendant by means of an explosive device."

## II.

### *Multi-party Representation by a Single Attorney*

After reviewing the record we conclude that the district court judge in this case made an adequate inquiry into the validity and voluntariness of the defendants' waiver of their right to separate counsel, and that in spite of the lack of complete disclosure by both sides, the inquiry was sufficient to assure an independent and knowing waiver. In addition, we find there was no actual conflict of interest at trial. While our analysis here closely tracks the district court's able treatment of the defendant's sixth amendment claims, we find it necessary to thoroughly discuss each issue.

### A. *Waiver*

The sixth amendment right to effective assistance of counsel clearly includes a right to conflict-free representation. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. DeRobertis,* 771 F.2d 1057 (7th Cir.1985); *Wilson v. Morris,* 724 F.2d 591, 593 (7th Cir.1984); *United States v. Bradshaw,* 719 F.2d 907 (7th Cir.1983); *United States ex rel. Williams v. Franzen,* 687 F.2d 944 (7th Cir. 1982); *United States v. Gaines,* 529 F.2d 1038 (7th Cir.1976); *United States ex rel. Robinson v. Housewright,* 525 F.2d 988 (7th Cir.1975); *United States v. Jeffers,* 520 F.2d 1256 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976). However, like any constitutional right, it can be waived. As we noted re-

cently in *Bradshaw,* 719 F.2d at 911, the standard for measuring an effective waiver of a constitutional right was set forth in the case of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938):

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

*Id.* at 464, 58 S.Ct. at 1023. The Supreme Court in *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), stated that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 748 (footnote omitted). *See also United States ex rel. Williams v. DeRobertis,* 715 F.2d 1174 (7th Cir.1983) (waiver of jury trial); *United States v. Frye,* 738 F.2d 196 (7th Cir.1984) (defendant did not knowingly and voluntarily enter guilty plea partly because of multi-party representation).[1] If a valid waiver is obtained, the defendant cannot at a later date attack his conviction based on an assertion of conflict. "A truly knowing and intelligent waiver accepted by the court will insulate a conviction from later attack." *United States v. Flanagan,* 679 F.2d 1072, 1076 (3d Cir.1982), *aff'd,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). *See also United States v. Gaines,* 529 F.2d at 1041; *United States ex rel.*

---

**1.** This case is different than *United States v. Frye* where we found that Fed.R.Crim.P.Rule 11 requires a district court to elicit narrative responses from a defendant before accepting a guilty plea. Biagio Cirrincione contends that *Frye* indicates that this circuit requires a district court to elicit narrative responses from defendants in a Rule 44(c) hearing. However, in *Bradshaw, supra,* at 914–15, we held that narrative responses were not necessary to meet the minimal requirement of Rule 44(c). We held that the drafters of 44(c) did not intend to adopt the Fifth Circuit's requirement of narrative responses to the court's inquiries outlined in *United*

*States v. Garcia,* 517 F.2d 272 (5th Cir.1975), nor the Second Circuit's implied rejection of such a requirement in *United States v. Mari,* 526 F.2d 117, 119 (2d Cir.1975), *cert. denied,* 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976). *Bradshaw* approved of a Rule 44(c) hearing that did not include narrative responses to the district court's inquiry. We explicitly refuse to impose the requirements of Rule 11 on Rule 44(c). But while narrative responses are not required, the district court should strive for a full colloquy with the defendants when they waive their right to separate counsel.

*Tonaldi v. Elrod,* 716 F.2d 431 (7th Cir. 1983).

Both Biagio and Tom Cirrincione claim that they did not knowingly and voluntarily waive their right to separate counsel, as outlined in *Johnson v. Zerbst,* because of the alleged inadequacies in the district court's Fed.R.Crim.P. 44(c) hearing. Rule 44(c) "provides a procedure for protecting a defendant's sixth amendment right to effective assistance of counsel where two or more defendants have been jointly charged or are to be jointly tried, and are represented by the same counsel." *United States v. Dressel,* 742 F.2d 1256, 1258 (10th Cir. 1984); *see also United States v. Burney,* 756 F.2d 787, 790 (10th Cir.1985). Under that Rule:

> [T]he court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise the court shall take such measures as may be appropriate to protect each defendants' right to counsel.

Fed.R.Crim.P. 44(c). While a defendant's claim that his defense was harmed by his attorney's divided loyalties implicates the sixth amendment, that constitutional mandate does not require automatic reversal unless a trial court fails to conduct an inquiry after either a timely conflict objection, *Holloway v. Arkansas,* 435 U.S. 475, 488, 98 S.Ct. 1173, 1180, 55 L.Ed.2d 426 (1978), or if the court "knows or reasonably should know a particular conflict exists." *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980); *United States v. Burney,* 756 F.2d 787, 791 (10th Cir.1985); *Wilson v. Morris,* 724 F.2d 591 (7th Cir.) *(en banc), cert. denied,* — U.S. ——, 104 S.Ct. 2357, 80 L.Ed.2d 829 (1984); *United States v. Unger,* 700 F.2d 445, 453 n. 17 (8th Cir.), *cert. denied,* 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983); *United States v. Benavidez,* 664 F.2d 1255, 1258 (5th Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352 (1982); *United States v. Foster,* 469 F.2d 1, 4–5 (1st Cir.1972).

As we noted recently in *Wilson,* 724 F.2d at 594, in "special circumstances" a trial court has a *sua sponte* duty to inquire into the propriety of joint representation, *see Cuyler,* 446 U.S. at 346–47, 100 S.Ct. at 1717, but the mere fact of joint representation is not a special circumstance. *See id.* at 346, 100 S.Ct. at 1717. We stated in *Wilson* that "properly understood, therefore, the duty to inquire in special circumstances is a reflection of the fact that absent an inquiry, the record will demonstrate that a particular conflict existed in violation of the Sixth Amendment." 724 F.2d at 594.

Turning to the record in this case, the prosecution sought and received a Rule 44(c) hearing from the district court because of the government's belief that defense counsel could not adequately represent both co-defendants. This case is different from the textbook example of either one defendant or the trial judge objecting to multi-party representation. Here the government foresaw the potential conflict and appropriately brought it to the court's attention. While the district court attempted to conduct a full and adequate inquiry into the voluntariness of the defendants' waiver, neither the prosecution nor the defense brought to the court's attention the extent of the defendants' pre-indictment contradictory statements, even though both had an obligation to bring all relevant information to the court's attention in the Rule 44(c) hearing. Both sides knew of the statements before the Rule 44(c) hearing, and the prosecution alluded to antagonistic evidence against the two defendants. But neither party specifically stated that the two defendants had directly contradicted each other. The Cirrinciones' statements are evidence of a *"particular* conflict" of which the trial judge should be made aware. While those contradictory statements are not in themselves enough to make the defendant's waiver invalid, see *infra* pages 627–28, they are without question the type of information that should

have been brought to the court's attention in a Rule 44(c) hearing.

Biagio and Tom Cirrincione contend that the district court's Rule 44(c) hearing was deficient for two reasons. First, they allege that the 44(c) hearing actually misled both defendants concerning their sixth amendment rights. Second, they claim the circumstances underlying Tom's and Biagio's involvement in the crime constitute a case in which the court should have refused to accept a waiver of joint representation.

Biagio and Tom Cirrincione allege that because of their familial relationship, rather than making them aware of the foreseeable prejudices their joint attorney's continued representation would entail, *United States v. Carrigan*, 543 F.2d 1053, 1055 (2d Cir.1976); *United States v. Gaines*, 529 F.2d 1038, 1043-44 (7th Cir.1976), the Rule 44(c) hearing actually produced the opposite result. They argue that the prosecutor and the court caused the father and son to fear the consequences of not continuing joint representation by one counsel:

> [Asst. U.S. attorney]: Judge, if I may, may I speak to them?
>
> \* \* \* \* \* \*
>
> I just want to make the record clear that both Mr. Tom Cirrincione and Mr. Biagio Cirrincione understand that their best strategy in this case might very well be to suggest to the jury or argue to the jury that "I'm not guilty because the other guy"—
>
> THE COURT: "the other guy did it."
>
> [Asst. U.S. Attorney]:— "did it."
>
> THE COURT: It is a typical, typical defense strategy in an arson case: I didn't do it, he did it.
>
> \* \* \* \* \* \*
>
> THE COURT: ... But it's important that you understand that you would have the right at trial to point the finger at some other defendant, including your father,

or in your case, the son ... But nevertheless, the typical defense is to point the finger at the other guy.

Biagio Cirrincione claims that given the simple choice of waiving his right to separate counsel and keeping his attorney, or choosing to incriminate his child, he chose the former. Biagio alleges that he did not knowingly and willingly waive his sixth amendment right to effective assistance of counsel but merely made the only choice a father can make: he refused to "point the finger" at his son and give aid to the government in the prosecution of Tom. By crudely putting the conflict issue to Tom, the trial court allegedly similarly deprived Tom of the opportunity to make a knowing and intelligent choice. Tom argues that because of his youth and limited formal education he was dependent upon Biagio both for emotional and financial support. Biagio was Tom's employer and paid Tom's share of the legal fees.[2]

Appellants argue that the dialogue between the prosecutor and the court established only that it was in the government's interest that the conflict issue be waived. The Cirrinciones claim that by emphasizing the negative aspects to separate counsel, the court obscured the benefits. In particular, appellants argue that the trial court should have determined whether or not Tom Cirrincione understood that the separate defense which minimized his own involvement, given his allegedly lesser role, would have better served his own interests, as well as the interests of his other family members. The gravamen of their complaint on appeal is thus if the decision to have separate counsel is made in the context of choosing whether to incriminate one's father or son, so long as both are represented by one lawyer, the likelihood of making such a choice knowingly and voluntarily is virtually nonexistent.

---

**2.** While the fact that one co-defendant pays the legal fees of another co-defendant may be evidence of dependence or dominance in another case, here there is no allegation that Tom Cirrincione did not understand that the court would appoint him counsel if he could not afford it. Nor is there any evidence that Tom and Biagio's attorney attempted to save the fee-payer, Biagio, at his son's expense.

■ In the present case, we conclude that the hearing that took place complied with Rule 44(c) and *Johnson v. Zerbst.* The district judge addressed Biagio and Tom personally and advised them that they had an "enormous problem" being represented by one lawyer. The district judge further explained that they had a right to separate representation and that such representation was in their best interests. The possibility of evidentiary rulings helpful to one and adverse to the other was raised, as was the importance of separate advice concerning the right to testify. The judge noted (in an attempt to demonstrate that asking for a separate attorney was a common occurrence) that in close relationships, particularly familial relationships, separate representation is often chosen. The judge then raised the possibility that it may be in a defendant's best interest to shift blame to the other defendant or to plead guilty. The judge informed the defendants that several other defendants had pled guilty and would be testifying against them, further complicating the decisions one attorney representing both defendants would have to make. Moreover, the court explained that uneven culpability can, and often does, result in different sentences.

Contrary to the Cirrinciones' allegations, the district court did not present the possibility of inculpating each other as the only reason for separate representation. While district courts should make clear that they are not attempting to convince a defendant to seek separate counsel or advocating a position proposed by the prosecution, but are merely informing him of his rights, it is clear that viewing the district court's admonitions as a whole, only objective information was imparted to the defendants. We find that the statements made by the district court judge were not misleading when placed in context.

Second, the appellants claim that because the particular circumstances of this case should have led the district judge to the conclusion that a conflict of interest was inevitable, the judge should not have accepted the defendants' waiver. The Cirrinciones argue that the conflict between Bia-

gio and Tom was so great that they could not constitutionally be allowed to waive their sixth amendment rights, regardless of their knowledge of the dangers of joint representation. *See United States v. Tocco,* 575 F.Supp. 100 (N.D.Ill.1983); *United States v. Helton,* 471 F.Supp. 397 (S.D.N.Y. 1979). Therefore, the Cirrinciones assert, the district court abused its discretion by not insisting on separate representation.

In *Tocco* the district judge ordered a private defense attorney disqualified from representing a single defendant where that lawyer had previously represented a prosecution witness who was subpoenaed to testify at trial for the government. The conflict arose from the contrary interests of the lawyer in cross-examining the witness effectively on his client's behalf and in maintaining privileged confidences of the witness. The Cirrinciones argue that in this case, Tom Cirrincione's sworn grand jury testimony (which allegedly incriminated Biagio Cirrincione and contradicted him on several material facts) was crucial, corroborative evidence for the prosecution. Thus, Tom Cirrinciones should have been considered a "government witness" against Biagio Cirrincione. Under those circumstances, the appellants argue that one attorney's representation of both the defendant Biagio Cirrincione and the witness against him, Tom Cirrincione, should have been found unacceptable.

In *United States v. Helton,* the court rejected the stated desire of co-defendant brothers to proceed with a single law firm. In *Helton* the multi-count indictment charged more crimes against one borther than the other, the relative proof of guilt was disparate, and the defenses or defense tactics available to the "less culpable" brother were inconsistent with or could have undermined the defense posture available to the "more culpable" brother, and vice versa. The court rejected the defense attorney's argument that there was no possibility of conflict because the co-defendants were brothers, saying "Query, however, whether the existence of familial ties among defendants does not militate in the

other direction, toward independent counsel who can take stances independent of family ties in advising their clients?" *United States v. Helton,* 471 F.Supp. at 399 n. 2. Accordingly, the court held that it was impossible for the Helton brothers to make a knowing and intelligent waiver of their right to effective assistance of independent counsel.

We are convinced that these district court cases do not adequately deal with a competing constitutional claim that stands equal to the right of conflict-free counsel. As this court said in *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 439 (7th Cir.1983):

> At the same time, however, the disqualification of a defendant's retained counsel is an invitation to make a different constitutional claim—the deprivation of "the right to counsel of one's choice." *United States v. Gaines,* 529 F.2d 1038, 1043 (7th Cir.1976). Indeed, one could say that the petitioner in this case did not waive his right to counsel unaffected by a conflict, so much as he asserted his right to select his own attorney. As Judge Friendly recently wrote, "the defendants' choice of joint representation, like that of self-representation, may sometimes seem woefully foolish to the judge. But ... the choice is mainly theirs; the judge ... is *not* to assume too paternalistic an attitude in protecting the defendant from himself." *United States v. Curcio,* 694 F.2d 14, 25 (2d Cir.1982) (emphasis in original).

Balancing these competing constitutional claims, we hold that only in unique circumstances can a court disqualify counsel over a defendant's objection when the sole basis for that disqualification is a potential for a conflict of interest of which both defendants are aware. This case does not present those circumstances. The cases cited by the Cirriciones all involve unique factual situations with much greater degrees of potential conflict than this case. The Cirriciones have failed to provide adequate evidence that the potential for conflict was truly inevitable as it was in *Helton.* Unlike the situation in *Tocco,* Tom Cirrincione's grand jury testimony was not direct evidence against his co-defendant and was amply buttressed by the testimony of other witnesses. Nor is there any evidence in this case that Tom and Biagio were not aware that they had made contradictory statements that would be admitted against each other. Nor is there even any allegation that their joint attorney was faced with a conflict of interest in keeping the confidences of one client against the interests of the other.

Therefore, after finding that the District Court's Rule 44(c) hearing was more than adequate, that it did not mislead or misinform the defendants, and that the potential for a conflict of interest was not so great as to be inevitable, we affirm the district court's finding of waiver.

## B. Actual Conflict of Interest

This case presents a classic conflict of interest situation where two criminal defendants, a father and a son, were represented by one attorney hired and paid by the father. As the Supreme Court stated in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), "a possible conflict inheres in almost every instance of multiple representation." Thus, "a reviewing court cannot presume that the possibility of conflict has resulted in ineffective assistance of counsel," for "[s]uch a presumption would preclude multiple representation even in cases where [a] common defense ... gives strength against a common attack." *Id.* at 348, 100 S.Ct. at 1718 (citations omitted). The question in this case is whether there was a common defense or whether the two co-defendants had mutually antagonistic positions that made it virtually impossible for them to be represented zealously and fairly by one attorney. As *Cuyler* pointed out, this factual inquest into the actual circumstances of a defendant's case is necessary if the defendant has affirmatively waived his right to conflict-free counsel. If separate counsel is not sought, after sufficient warning by the trial judge of the dangers inherent in multi-party representation by a

single attorney, then two co-defendants "must demonstrate that an actual conflict of interest adversely affected [their] lawyer's performance during their joint trial." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718; *see also Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *United States ex rel. Cole v. Lane*, 752 F.2d 1210, 1217 (7th Cir.1985).

An actual conflict of interest that adversely affected the defendants' lawyers' performance must be evidenced by specific instances in the record.[3] *See generally, United States v. DeRobertis*, 771 F.2d 1057 at 1062 (4th Cir.1985). *See also United States v. Burney*, 756 F.2d 787 (10th Cir.1985); *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir.), *cert. denied*, 464 U.S 991, 104 S.Ct. 481, 482, 78 L.Ed.2d 679 (1983); *Foxworth v. Wainwright*, 516 F.2d 1072, 1077 n. 7 (5th Cir.1975).

Our analysis now turns to whether there was an actual conflict during the defendants' trial. Once a conflict that adversely affected the lawyer's performance has been identified, prejudice to one or both of the defendants is presumed. *Strickland*, 104 S.Ct. at 2067. This presumption of prejudice is necessary because a true conflict of interest forecloses several trial strategies, such as plea negotiations, agreements to testify, the decision whether to testify at all, and arguments at sentencing. Thus, a test to determine whether there was actual prejudice would be impossibly speculative. *Holloway v. Arkansas*, 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1975). The importance of this presumption of prejudice has been re-emphasized in several recent Supreme Court cases. *See United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2048 n. 28, 80 L.Ed.2d 657 (1984); *Strickland*, 104 S.Ct. at 2067; *Flanagan v. United States*, 465 U.S. 259, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984). *See also United States v. DeRobertis*, 771 F.2d 1057 at 1062.

The premise of both Biagio and Tom's claims that they were denied conflict-free assistance of counsel must be that they had available to them a plausible alternative to the "common defense" they presented. If there was no alternative, then there could be no "ineffective choice" made by their counsel. Biagio and Tom must point to something significant that their lawyer would have done differently had he not represented both of them. The starting point in this investigation must be the government's case against them.

Steven Pace was arguably the central witness whose testimony linked Biagio and Tom Cirrincione to the bombings. Although a number of witnesses could confirm that Biagio and Tom Cirrincione knew Pace, and that Tom Cirrincione had talked with him on different occasions, arguably only Pace's testimony linked the Cirrinciones directly to the arsons. The government had strong evidence that the Cirrinciones had a motive to harm the Paleses' restaurants and had actually threatened to do so, but the defense had available to it a number of facts which might suggest that the Paleses themselves had a motive to commit the arsons. The government could also prove that Biagio had lied prior to trial when he was asked if he knew Steve Pace,

---

**3.** As the district court pointed out to the defendants in this case, an obvious conflict exists where defendants are maintaining their own innocence and attempting to pin guilt on each other. This is a possibility in cases of uneven culpability, where a defendant's best strategy might be to shift blame on co-defendants. In such cases, for example, an attorney may be prevented from effective examination of witnesses. The Supreme Court noted that where the evidence of guilt is uneven, an attorney may be prevented from inquiring into a plea agreement in which the pleading defendant agrees to testify against a co-defendant. *Holloway*, 435 U.S. at 489–90, 98 S.Ct. at 1181. In *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), the Court saw as a potential conflict the fact that one attorney represented an employer and his employees, where the employer had plans for creating precedents favorable to his business that may have prevented the attorney from adequately representing the employees. 450 U.S. at 269, 101 S.Ct. at 1102. Finally, defendants jointly represented may demonstrate a conflict at sentencing when one defendant was less culpable than the other. *Holloway*, 435 U.S. at 489–90, 98 S.Ct. at 1181. However, in this case the Cirrinciones were represented by separate counsel at sentencing.

and that Tom Cirrincione had told the truth about knowing Pace and seeing him on various occasions.

Faced with this evidence, the obvious defense was that Pace was lying in order to save himself and picked the Cirrinciones on whom to pin the crimes because they were plausible perpetrators. An alternative defense to blaming the arsons on a third party such as the Paleses or Pace alone would be to blame the arsons on each other. But obviously the argument that Pace lied about both Cirrinciones is more plausible than for either defendant to argue that Pace was lying about *his* involvement but telling the truth about the involvement of *one* of the other defendants. Therefore, the common defense that the bombings were committed by Pace for the Paleses themselves, because they were nearing bankruptcy, was a plausible strategy that in itself does not demonstrate any conflict of interest. The path chosen in no way leads unquestionably to the conclusion that the defendant's counsel was hampered by divided loyalties. The strategy in itself is not specific evidence on the record of a conflict of interest.

 In fact, the only example of adverse impact that Biagio claims to be the result of joint representation is that Tom Cirrincione decided not to take the stand. By not taking the stand Tom chose not to rebut his grand jury testimony, which incriminated Biagio. But this is not a decision that can be clearly attributed to divided loyalties on the part of Biagio's attorney. If Biagio and Tom had separate counsel, there is nothing to indicate that Biagio's counsel could have persuaded Tom to testify. In fact, since Biagio's argument implies that it was in Tom's best interest not to testify (in that their joint counsel was protecting Tom at Biagio's expense), the result would have presumably been the same had there been separate counsel. *See United States v. Alberti,* 470 F.2d 877, 881 (2d Cir.1972) (no reason to believe separate counsel could have done better; no conflict creating prejudice). There is, therefore, no evidence of any actual conflict in relation to Biagio, so we now turn to Tom Cirrincione's claim.

Tom Cirrincione's primary argument is that his decision not to plead guilty and cooperate with the government was based on advice his attorney gave him: advice that was calculated only to protect Biagio, the dominant defendant and paying client. With Biagio's flat denial of any involvement in or knowledge of the conspiracies standing against Tom's contradictory testimony, the stage was set for a classic conflict of interest situation. By corroborating a few of the aspects of Steve Pace's story, Tom had apparently incriminated himself in crimes that according to the government were committed at the direction of Biagio. Pace's statements to the government before trial indicated that Tom's involvement in one of the conspiracies was at Biagio's behest, and thus the government did not charge Tom in both conspiracies. The very fact that the two defendants were charged with different offenses arising out of different evidence helped bring the conflict to the fore.

The incongruity of the defendants' versions of the facts could be reconciled in either of two ways: Biagio told the truth and Tom perjured himself; or Tom revealed that his father had lied to an Assistant United States Attorney in order to avoid detection as an accomplice, a co-conspirator, and a principal to several federal crimes. Bluntly stated, each defendant was impliedly calling the other a liar in pre-trial testimony. This is, however, only a demonstration of *potential* conflict of interest at trial.[4] While it is an adequate

---

4. If Tom's decision not to negotiate a plea agreement was based on his counsel's advice, there is no evidence that such advice was the product of divided loyalties. The mere possibility of divided loyalties is insufficient to sustain the defendant's burden. In *Cuyler,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court contrasted *Glasser,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), where there was no way to explain counsel's failure to cross-examine government witnesses other than divided loyalty, with *Dukes v. Warden,* 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972). In *Dukes,* the defendant Dukes alleged that his lawyer recom-

showing of pre-trial antagonism, the defendants must show specific instances where their attorney could have, and would have, done something different if that attorney had represented only one defendant.

Here Tom alleges that the potential for conflict actually came to fruition at trial. Tom claims that it was his best interest to testify at trial because his grand jury testimony had already been admitted. But because his testimony could potentially hurt his father, the father testified but the son did not. However, it is not clear how Tom's testimony, if his attorney would have "allowed" him to testify, could have hurt Biagio. The potential danger of Tom's testimony is defused by three other witnesses who corroborated the events detailed in Tom's testimony. Their testimony makes it highly unlikely that Tom refused to take the stand simply to prevent this evidence from being introduced against Biagio. Tom further claims that there was a conflict because he was precluded from cross-examining Biagio. It is not clear what Tom's defense would have gained from cross-examining Biagio; there is nothing in the record inculpatory of Tom that was not already corroborated by other witnesses' testimony.

We conclude that the defendants in this case have shown only a potential for conflict, but have not adequately demonstrated specific instances at trial where their representation was ineffective because of that representation's dual duties.

### III.

#### Severance

The Cirrinciones claim that their constitutional right of confrontation under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was violated by the admission in evidence of pretrial statements that would not have come in had the trial been severed pursuant to Rule 14 of Federal Rules of Criminal Procedure. We affirm the district court's denial of the defendant's motion for severance because neither statement specifically identifies a co-defendant, and "[w]hen a co-defendant's extra-judicial statement ... does not directly implicate the defendant, the *Bruton* rule does not come into play." *United States ex rel. Cole v. Lane,* 752 F.2d 1210, 1216 (7th Cir.1985).

The defendants originally filed a motion that alleged improper joinder of defendants, which the district court treated as a motion for severance. At that time, the district court was not informed of the contradictory pretrial statements by either party, and the defendants alleged only the danger of prejudice from a "spillover" of evidence from one conspiracy charge to another. Tom and Biagio Cirrincione allege here proper but prejudicial joinder under Fed.R.Crim.P. 14.[5]

mended that he plead guilty and then urged leniency for a co-defendant by arguing that the co-defendant's cooperation was what had induced Dukes to plead. It was *possible* that Dukes's attorney's advice to plead guilty was the product of divided loyalties. But it is the defendant's burden to demonstrate the connection, and the Court rejected Dukes's claim because it found "nothing in the record ... which would indicate that the alleged conflict resulted in ineffective assistance of counsel and did in fact render the plea in question involuntary and unintelligent." *Id.* at 256, 92 S.Ct. at 1554 (citation omitted). Thus, by contrasting *Glasser* with *Dukes,* the Court in *Cuyler* made it clear that the defendant cannot sustain his burden of showing that an actual conflict adversely affected his lawyer's performance by merely pointing to the fact that this was a reasonable possibility. Similarly, this Court in *United States ex rel. Cole v. Lane,* 752 F.2d 1210 (7th Cir.1985) rejected

defendant's argument that he would have pursued a different course of action if he had had separate counsel, noting that the record contained no support for the defendant's assertion.

5. Fed.R.Crim.P. 14 states:
 Rule 14. Relief from Prejudicial Joinder
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

**632**

The ordering of a severance under Rule 14 is a matter committed to the sound discretion of the trial court, and its determination will not be disturbed on appeal in the absence of an abuse of discretion. *United States v. Dounias,* 777 F.2d 346, 349 (7th Cir.1985); *United States v. Harris,* 761 F.2d 394, 401 (7th Cir.1985); *United States v. Blue,* 440 F.2d 300 (7th Cir. 1971). In order to succeed under Rule 14, the defendants must show that they were denied a fair trial as a result of the failure to sever. *United States v. Hattaway,* 740 F.2d 1419, 1424 (7th Cir.1983); *Blue,* 440 F.2d at 300. Appellants complain that they were actually prejudiced by the introduction in evidence of the statements of Tom Cirrincione and Lester Lewis, a convicted co-defendant who did not appeal. Biagio complains of the statements of both Tom and Lester Lewis, and Tom complains of the statement of Lester Lewis.

While the statements of Tom Cirrincione and Lester Lewis are quite different, they are similar in the manner in which they assertedly violate *Bruton.* In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the court held that a defendant's right to confront the witnesses against him was violated by the admission of a co-defendant's confession, in which the declarant admitted that he committed the crime and that he committed it with the co-defendant. There, one defendant's confession, implicating a co-defendant, was admitted solely against the declarant. The court reversed the defendant's conviction, finding that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extra-judicial statement in determining petitioner's guilt, admission of [declarant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. at 1622. One way to avoid *Bruton* problems is to conduct separate trials, so the confession may be used against the declarant without adverse effects on co-defendants.

*Bruton* involved a statement that directly implicated the co-defendant in the commission of the crime. The statements of Tom Cirrincione and Lester Lewis are obviously not confessions naming co-defendants, the kind of statement that *Bruton* found offensive because it was so "powerfully incriminating." *Id.* at 126, 88 S.Ct. at 1622. As this court has held, "[w]hen a co-defendant's extrajudicial statement ... does not directly implicate the defendant, the *Bruton* rule does not come into play." *United States ex rel. Cole,* 752 F.2d at 1216. *See also United States v. Madison,* 689 F.2d 1300, 1309 (7th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983) (generally statements of a co-defendant that do not name the defendant do not violate *Bruton* ). Neither Tom Cirrincione nor Lester Lewis confessed to the crimes with which they were charged, and neither of them claimed that the complaining defendants committed those crimes. Tom merely admits that he and his father knew Steve Pace and saw him on Christmas day 1981. Such an admission, although it corroborates Pace's testimony to a certain degree, can hardly be the subject of complaint by Biagio since he admitted in his own testimony that he knew Steve Pace and talked with him on a number of occasions. While Biagio did not admit to having seen Pace on Christmas day, 1981, he did not deny that Pace was at his house since there were so many people there he did not see all of them. Tom's

While Appellants do not specify whether they now allege improper joinder in violation of Fed. R.Crim.P. 8(b), or proper but prejudicial joinder under Fed.R.Crim.P. 14, we find that Rule 14 is more appropriate. Joinder under Rule 8(b) is proper so long as each defendant involved is alleged to have participated in at least one of a series of acts constituting the offenses charged. Because the Cirrinciones do not argue on appeal that the offenses charged in the indictment did not constitute a "series" within the meaning of the rule, it is apparent that defendant's argument here more appropriately relies on Rule 14. *See* Wright, *Federal Practice and Procedure: Criminal 2d* § 144 at 506–507 (1982). Therefore, we need not reach the question of whether Appellants would be barred from raising a Rule 8(b) argument on appeal because it was not raised until after trial. Wright, *Federal Practice and Procedure: Criminal* 2d § 145 at 528 (1982).

admissions fit Biagio's trial strategy. Biagio could not deny that he knew Pace since several other witnesses testified that he had employed Pace off and on for several years as a delivery man and kitchen assistant. Thus, Tom's statements were merely cumulative of other evidence. We have held that where a co-defendant's statement is merely additional evidence of a fact already testified to, that statement does not violate *Bruton*. *See, United States ex rel. Cole*, 752 F.2d at 1217 (co-defendant statement that defendant was present at the scene of the crime does not violate *Bruton* where other evidence of defendant's presence had already been admitted).

Nor is Lester Lewis's pretrial statement "powerfully incriminatory" evidence that was not buttressed by the testimony of other witnesses. Lewis could not identify the person (allegedly Tom Cirrincione) for whom Pace was working. Lewis testified that he met Pace and "another guy" at a discotheque on Division Street, but he did not indicate the race, let alone identity of this "other guy." Moreover, Tom admitted in his grand jury statement that he met Pace and a black man one night at Mother's disco on Division Street. Tom's argument would have to be that this could not have been the meeting where Pace and Lewis met with "the other guy" (presumably a member of the Palese family) to discuss the job Pace was planning. For the same reasons, neither Tom's admission that he had once met Pace and a black man in a Division Street bar nor Lewis's statement that he met with Pace and "another guy" to discuss money for the job Pace was planning can be said to be "powerfully incriminating" of Biagio, since they do not even link Tom with the crime, much less Biagio. In fact Tom's willingness to testify about such a meeting before the grand jury tends to support the argument that the meeting he admitted could not have been the one Lewis discussed.

We conclude that the district court was correct in finding that *Bruton* was not violated because the statements in question were cumulative and did not actually identify a co-defendant. Under these circumstances we cannot find that the trial court abused its discretion.

## IV.

### *Use of an Interpreter*

Biagio Cirrincione claims that the lack of an interpreter at pretrial proceedings and the lack of an official interpreter at trial denied him procedural due process. Biagio relies on the case of *United States ex rel. Negron v. New York*, 434 F.2d 386, 389 (2d Cir.1970), which stated:

> [F]airness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial, *see e.g., Lewis v. United States*, 146 U.S. 370, 372, 13 S.Ct. 136 [137] 36 L.Ed. 1011 (1892), unless by his conduct he waives that right. *See e.g., Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). And it is equally imperative that every criminal defendant—if the right to be present is to have meaning—possesses "sufficient presentability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1962) (per curiam) [footnote citation omitted]. Otherwise, "[t]he adjudication loses its character as a reasoned interaction * * * and become an invective against an insensible object." Note, Incompetency 2 Stand Trial, 81 Harv.L.Rev. 454, 458 (1969).

In *Negron* the Second Circuit held that the limited use of a translator in the prosecution and jury trial of a Spanish-speaking defendant violated the requirements of fundamental due process. The court made clear that a foreign language defendant's capacity to understand and appreciate the proceedings, to participate with his counsel, to confront his accusers, and to waive rights knowingly and intelligently, is undermined without an interpreter actively participating in his defense.

More recently the Second Circuit held that a hearing on an alien's petition for

admission into the United States is "of no value when the alien and the judge are not understood." *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984); *see generally, Gonzales v. Zurbrick*, 45 F.2d 934, 937 (6th Cir.1930). We agree with the Second Circuit that "the very essence of due process is a 'meaningful opportunity to be heard.'" *Augustin*, 735 F.2d at 37 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970)).

In *The Japanese Immigrant Case*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903), however, the Supreme Court specifically held that in a deportation hearing no translator was necessary to meet the requirements of the due process clause of the United States Constitution.[6] Without discussing the continued validity of this holding, it is clear that an asylum proceeding is a civil proceeding, not penal, *see generally, Johannessen v. United States*, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912); *Schneiderman v. United States*, 320 U.S. 119, 160, 63 S.Ct. 1333, 1353, 87 L.Ed. 1796 (1943); *United States v. Schellong*, 717 F.2d 329, 336 (7th Cir.1983); *United States v. Minerich*, 250 F.2d 721, 726 (7th Cir. 1957), and thus the Japanese immigrant seeking asylum is not accorded the full panoply of due process rights that the defendant in this criminal trial receives.

■ We hold that a defendant in a criminal proceeding is denied due process when: (1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

■ In this case the trial court reviewed Biagio's claim and found, both by its observation of Biagio and through the hearing held to determine his ability to understand English, that Biagio both understands and speaks English. The record shows that during extensive direct and cross-examination Biagio rarely used the interpreter, which the district court allowed him to use even though the judge was convinced that Biagio did not need one. This case thus is easily distinguished from *Negron*. In *Negron* it was uncontested that the defendant neither spoke nor understood *any* English. In addition, in respect to the testimony against him, the defendant in *Negron* had an interpreter available to him only twice in

---

**6.** *The Japanese Immigrant Case* was one of a series of Supreme Court cases stemming from congressional efforts to limit the immigration of Chinese and Japanese aliens to the United States. Near the end of the nineteenth century Congress responded to the influx of Asian immigrants by enacting a sweeping administrative scheme designed to detain and summarily exclude aliens of Chinese or Japanese descent found entering the United States illegally. *See Rosado v. Civiletti*, 621 F.2d 1179, 1198 (2d Cir. 1980). In *The Japanese Immigrant Case* the Supreme Court decided that the final authority conferred upon executive officers to pass on the status of immigrants by that scheme did not permit an arbitrary disregard of due process. Therefore, a hearing had to be held. Since the petitioner in that case did receive a hearing in English the Court concluded her constitutional rights had not been violated. The Supreme Court stated:

> It is true that she pleads a want of knowledge of our language; that she did not understand the nature and import of the questions propounded to her; that the investigation made

was a "pretended" one; and that she did not, at the time, know that the investigation had reference to her being deported from the country. These considerations cannot justify the intervention of the courts. They could have been presented to the officer having primary control of such a case, as well as upon an appeal to the Secretary of the Treasury, who had power to order another investigation if that course was demanded by law or by the ends of justice. It is not to be assumed that either would have refused a second or fuller investigation, if a proper application and showing for one had been made by or for the appellant.

> \* \* \* \* \* \*

> If the appellant's want of knowledge of the English language put her at some disadvantage in the investigation conducted by that officer, that was her misfortune, and constitutes no reason, under the acts of Congress, or under any rule of law, for the intervention of the court by *habeas corpus*.

*Id.* at 102, 23 S.Ct. at 615.

the course of his four-day trial. On those two occasions the interpreter spent approximately 20 minutes with him summarizing the testimony of all the witnesses who had testified against him. The interpreter never translated their testimony simultaneously for him, and was apparently not even present for all of the testimony. Therefore, in *Negron* the testimony was undoubtedly incomprehensible to the defendant, and because the interpreter was not even present during some testimony, the accuracy and scope of her summary are subject to grave doubt.

We find that Biagio Cirrincione's claim does not meet this standard and thus we affirm the court below in this regard.

## V.

### *Hearsay*

■ Finally, the Cirrinciones argue that the admission into evidence of what the prosecution told Tom Cirrincione prior to his grand jury testimony was improper and denied them their right to a fair trial. Before Tom Cirrincione testified to the grand jury, he and his attorney met with an Assistant United States Attorney named Joe Hartzler. At that time, Tom stated that he knew Steven Pace, but that Pace had never worked for him. Ronald Sacolick, who was a case agent for the government, was present at the interview.

At the trial, the government called Agent Sacolick to the stand to testify about the interview. During his testimony, the following dialogue took place:

> ASSISTANT U.S. ATTORNEY: At any point in time was the questioning stopped?
>
> AGENT SACOLICK: Yes, at that time Joe Hartzler told Tom Cirrincione that he knew Tom Cirrincione was lying to them, to us, and that he knew in fact that—

After objections by defendants' counsel, the Assistant United States Attorney stated: "Judge, this is offered not for the truth of the matter but to establish what comes next."

We find that the statement was not offered for the truth of the prosecutor's be-

lief, but was relevant to Tom Cirrincione's state of mind when he entered the grand jury to testify. The fact that the prosecutor made that statement was arguably what persuaded Tom Cirrincione to admit to the grand jury that he and his father had in fact employed Steven Pace. The statement was explicitly offered only to help explain what happened when Cirrincione changed his statement, and the court carefully instructed the jury not to consider the prosecutor's belief as true.

Defendants further allege that their right to a fair trial was compromised and prejudiced because Agent Sacolick's recollection was unnecessary and inflammatory. Because Tom Cirrincione did not testify, and thus the jury could not independently weigh his credibility, he argues that the trial court's instruction to the jury not to consider the prosecutor's belief as true was insufficient. We hold that the instruction was sufficient to dispell any potential prejudice.

Furthermore, that potential for prejudice was nullified because the evidence in question was merely cumulative, and thus its admission was harmless. At no point during the trial did the defendants dispute that Steven Pace had been employed by Tom and Biagio Cirrincione. By the time in the trial that Sacolick described the interview, the jury had already heard from two other witnesses that Pace had worked for the Cirrinciones. The appellants' argument is without merit because the evidence at trial overwhelmingly established that Cirrincione had indeed been lying before he entered the grand jury room and any error in admitting the statement accordingly was. harmless. *See United States v. Carter*, 720 F.2d 941, 948–49 (7th Cir.1983) (hearsay admission was deemed to be harmless error since statement was merely cumulative); 4 J. Weinstein and M. Berger, *Weinstein's Evidence*, ¶ 801(c)[01] (1985).

## VI.

### *Conclusion*

After a careful consideration of appellants' other claims and an extensive review

of the record, we hold that for the above-stated reasons the district court is affirmed.