In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3902, 00-1516, 00-1524 & 00-1525

United States of America,

Plaintiff-Appellee,

v.

Wilton Johnson, Jose J. Salazar,
Javier C. Santa Cruz, and Jesus G. Guzman,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 98 CR 845--George W. Lindberg, Judge.

Argued/* February 26, 2001--Decided April
23, 2001

Before Bauer, Posner, and Kanne, Circuit
Judges.

Bauer, Circuit Judge. This opinion
addresses a multi-issue appeal from a
multi-defendant criminal drug trial. Our
examination of this case leads us to
affirm on all claims.

BACKGROUND

In early November 1998, Octavio Holguin
asked Wilton Johnson to transport drugs
for him from El Paso, Texas to the Days
Inn Hotel in Shorewood, Illinois. Johnson
and two others piled into a truck with a
trailer attached and headed out to pick
up over 500 kilograms of bricked cocaine
in boxes from Holguin. En route to
Illinois, the men were pulled over on a
traffic stop, whereupon Johnson consented
to a search of the truck. The men were
arrested and agreed to perform a
controlled delivery with DEA agents. So,
Johnson called Holguin to tell him that

they would arrive in Illinois a day late due to car troubles. When the men finally arrived at the Days Inn, Johnson paged Holguin, who had driven up from El Paso with Jose Jesus Salazar.

Shortly after Johnson had paged Holguin, Salazar and Javier Carrillo Santa Cruz emerged from one of the hotel rooms and walked through the parking lot to the truck. They milled around the truck, got in, pulled it slightly forward, got out, and peeked inside the trailer. During the next hour, Salazar and Santa Cruz repeated this dance two more times, but on both occasions, they also went inside the trailer for a spell, seemingly moving the boxes near the door of the trailer to ease their eventual removal. On Salazar and Santa Cruz' fourth jaunt from the hotel room to the trailer, Guzman joined them, whereupon he proceeded to drive a van up to the rear of the trailer. Salazar and Santa Cruz opened the trailer doors, Guzman opened the van doors. All three then began to move one of the boxes out of the trailer and into the van. At that point, DEA agents moved in to arrest the men. Salazar consented to a search of the Days Inn hotel room, in which a bank deposit receipt was found. The receipt revealed that Santa Cruz had deposited approximately 34,000 pesos into Salazar's bank account in Mexico about two months prior. Holguin was never apprehended.

Johnson, Guzman, Santa Cruz, and Salazar were charged with conspiracy to possess 500 kilograms of cocaine with intent to distribute it under 21 U.S.C. sec. 846 (Count 1). Guzman, Santa Cruz, and Salazar were also charged with possession of 500 kilograms of cocaine with intent to distribute it under 21 U.S.C. sec. 841(a)(1) (Count 2). A jury found Johnson, Guzman, and Salazar guilty as charged, and Santa Cruz guilty only on Count 2, and district court sentenced them. Defendants appeal their convictions and sentences.

DISCUSSION

I. Court-Appointed Interpreters

Salazar, Santa Cruz, and Guzman complain that the district court abused its discretion under the Court Interpreters Act, 28 U.S.C. sec.sec. 1827, 1828 ("CIA") and violated their Fifth and

Sixth Amendment rights by not providing an additional court-appointed interpreter to sit at the defense table, thereby inhibiting their ability to simultaneously communicate with counsel.

A.   The Court Interpreters Act

The CIA relevantly provides:

The presiding judicial officer . . . shall utilize the services of the most available certified interpreter . . . in judicial proceedings instituted by the United States, if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case) . . .

(A) speaks only or primarily a language other than the English language . . . so as to inhibit such party's comprehension of the proceedings or communication with counsel . . . .

28 U.S.C. sec. 1827(d)(1). A defendant entitled to an interpreter under sec. 1827(d) may waive this right "only if ap proved by the presiding judicial officer and made expressly by such individual on the record after opportunity to consult with counsel and after the presiding judicial officer has explained to such individual . . . the nature and effect of the waiver." 28 U.S.C. sec. 1827(f)(1). If the presiding judicial officer finds under sec. 1827(d) that the appointment of an interpreter is not necessary, "an individual requiring the services of an interpreter may seek assistance of the clerk of court or the Director of the Administrative Office of the United States Courts in obtaining the assistance of a certified interpreter." 28 U.S.C. sec. 1827(e)(2). Further, the "capacity for simultaneous interpretation services" shall be provided in multi-defendant criminal cases. 28 U.S.C. sec. 1828(a).

Throughout the entire trial in this case, a court-appointed interpreter simultaneously translated the proceedings from English to Spanish through a microphone that fed into headsets worn by the defendants. During the government's case in chief, near the end of the cross-examination of the third of its eight witnesses by the last of four defense

attorneys, one of the defense attorneys (the third to cross-examine this witness) asked the court for a sidebar, which went as follows:

MR. CARLSON [Salazar's attorney]:  It really isn't a problem, but my client-- because we have an interpreter here, my client sometimes has questions for me and wants to ask me certain things.

When I came back to my chair [after I cross-examined this witness], he indicated that he wanted to speak to me before I finished.

I can't understand anything he's saying, and the interpreter was being used at the time.

Instead of interrupting the direct examination--or the cross-examination of Mr. Saltzman [Santa Cruz' attorney], I wanted to wait until I had a chance.

I was just wondering--and I don't care whether the Government wants to go ahead and do their--any redirect they have and, then, take a short break so I can talk to my client and find out if there is any other questions he has of this witness.

And I think that might be advisable for all of the defendants.

MR. SALTZMAN:  It might be good if he did it when I'm done.

THE COURT:  We will take a brief recess now, okay.

Trial Tr. at 178-79. Then, before the government's fourth witness took the stand, the following colloquy took place between the district court and the defense attorneys:

MR. CARLSON:  Judge, one quick matter. . . . [My client] has some concerns about his ability to be able to communicate with me during the course of the trial, especially during the course of the testimony that's going on, because he is unable to convey his thoughts to me as witnesses are testifying.

He is very concerned that he's not going to be able to put his input into--and fully advising me as to matters during the testimony.

We have--unfortunately--only one interpreter here, and the interpreter is interpreting for the Court as well as the defendants.

And, additionally, there are three defendants who require the services of an interpreter. But my client is just having some very severe problems and concerns about the lack of ability to communicate with me due to the language difficulty.

THE COURT:  Okay. Do you have a suggestion or, otherwise, I will tell you what we will do.

MR. CARLSON:  Judge, I would just like there to be-- if your Honor has a better way, that's fine--some break in the testimony both before cross-examination begins, and then before cross-examination--cross-examination ends, so we can sit and try to get input from our clients.

THE COURT:  Okay.

MR. SALTZMAN:  I would join in that too, Judge.
THE COURT:  Let's do it this way then. Your clients should take down their notes, just as the jury does, take them in Spanish, and then you can simply ask for a few moments while the interpreter reviews with you the notes.

I will be glad to give you that time. There is no problem.

MR. CARLSON:  That's fine. Thank you, Judge.

THE COURT:  Okay.

Trial Tr. at 189-90.

Appellate counsel decries the "flawed 'solution' devised by the district court." However, it is clear from the colloquy that the "flawed solution" was not "devised" by the district court, but rather was proposed by defense counsel. Defense counsel asked the court for breaks before cross-examination and near the close of cross to use the interpreter to confer with the defendants. Since defense counsel did not actually request that an additional court-appointed interpreter be appointed to sit at the

defense table, it cannot be said that the district court expressly denied the defendants an additional interpreter to aid them in simultaneously communicating with their attorneys. What the district court did do was agree to implement the request of defense counsel.

What the defendants' appellate counsel's argument really boils down to is that the district court was obliged to sua sponte appoint an additional interpreter because criminal defendants have a right to have an interpreter sit at the defense table to effectuate simultaneous communication with counsel. Counsel's argument raises at least two questions in this case: (1) what are the statutory duties of a district court when non-English speaking defendants are before it?; and (2) what right does a defendant in a criminal trial have regarding an interpreter?

One of the purposes of the CIA is "to ensure that the defendant can comprehend the proceedings and communicate effectively with counsel" through the appointment of a certified interpreter. United States v. Febus, 218 F.3d 784, 791 (7th Cir. 2000). However, the CIA was not enacted to "create new constitutional rights for defendants or expand existing constitutional safeguards"; rather, the CIA was enacted "to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators in order to ensure that the quality of the translation does not fall below a constitutionally permissible threshold." United States v. Joshi, 896 F.2d 1303, 1309 (11th Cir. 1990) (citing H.R.Rep. No. 1687, 95th Cong., 2d Sess. at 2-4 (1978), reprinted in, 1978 U.S.Code Cong. & Admin.News 4652, 4652-54). We afford district judges wide discretion in assuring that the CIA's purposes are realized in their courtrooms. See Febus, 218 F.3d at 791-92.

District judges are entrusted with great discretion because defendants do not have an automatic right to an interpreter under sec. 1827(d). Rather, a defendant is only statutorily entitled to the appointment of an interpreter if the district court determines that the defendant: (1) speaks only or primarily a language other than the English language; and (2) this fact inhibits their

comprehension of the proceedings or communication with counsel. In making this determination, a district court must evaluate a "'variety of factors, including defendant's knowledge of English and the complexity of the proceedings and testimony . . . .'" Id. at 791. District courts have a duty to evaluate these factors when put on notice that the defendant speaks only or primarily a language other than English. See 28 U.S.C. sec. 1827(d)(1). District courts may be put on notice by motion of the parties, or by the court's own recognition, when it is clear that the defendant's communication with the court or counsel is inhibited by language. Once a district court is on notice, it has a duty to inquire as to whether the fact that the defendant speaks only or primarily a language other than English inhibits his or her ability to comprehend the proceedings and communicate with counsel. Since the district court is best positioned to make this evaluation, we review the decision of whether to appoint an interpreter and how to use the interpreter for abuse of discretion. See United States v. Rosa, 946 F.2d 505, 508 (7th Cir. 1991) (citing United States v. Moya-Gomez, 860 F.2d 706, 740 (7th Cir. 1988)).

In this case, the district court appointed an interpreter to ensure that the defendants could comprehend the proceedings through simultaneous translation. There is also no question that the interpreter was qualified and adequately translated the proceedings. The problem, according to the defendants, was that since they could only communicate with their attorneys via the one court-appointed interpreter when breaks in testimony were requested, they were denied the opportunity to simultaneously communicate with their attorneys. Similar factual scenarios have been encountered by other circuit courts.

For example, the Eleventh Circuit in United States v. Bennett was presented with the exact same issue as in this case; specifically, whether the district court had abused its discretion by failing to supply individual court-appointed interpreters to each of the Spanish-speaking defendants in a multi-defendant trial. See 848 F.2d 1134, 1139-41 (11th Cir. 1988). The district court

appointed one interpreter who simultaneously translated the proceedings from English to Spanish through a microphone that fed into headsets worn by the defendants. See id. at 1140. The defendants asked the district court for the appointment of an individual interpreter for each defendant so that they could communicate with their counsel at the defense table. See id. The district court denied the request. See id. Instead, the district court "offered to recess the proceedings at any time they needed to consult their attorneys through the interpreter." See id. at 1141. The district court never denied any requests for such a recess. See id. On appeal, the Eleventh Circuit held that "the district court's appointment of a single interpreter satisfied the requirements of the [CIA]." Id. at 1140.

Further, in United States v. Sanchez, the Sixth Circuit addressed a somewhat similar situation. See 928 F.2d 1450, 1454-56 (6th Cir. 1991). The district court had appointed two interpreters, one for each defendant at the defense table to aid in communicating with counsel. See id. at 1454. At one point during the trial, the district court borrowed one of the interpreters to translate the testimony of a Spanish-speaking government witness. See id. This meant that both defendants had to share the other interpreter while the witness testified. See id. On appeal, defendants said that this prevented them "from effectively communicating with counsel during a critical stage of their trial." Id. The court held that the CIA does not require that each defendant be provided with a personal interpreter. See id. at 1455. In so holding, the court stated:

There is nothing in the language of the [CIA] or in the legislative history which requires every defendant in a multi-defendant criminal action be provided with his own individual interpreter. To the contrary, the [CIA] itself authorizes the use of a single interpreter in multi-defendant cases.

* * *

When utilizing a single interpreter during a multi-defendant action, the district court must always be cognizant of the underlying purposes of the [CIA].

The district court must provide each defendant the time and the ability to confer effectively with counsel throughout the proceedings.

Id. at 1455-54; see United States v. Yee Soon Shin, 953 F.2d 559, 561 (9th Cir. 1992) (finding no error when district court appointed one interpreter for two defendants and holding that the CIA does not require separate interpreters for each defendant in multi-defendant cases); United States v. Lim, 794 F.2d 469, 471 (9th Cir. 1986) (finding no error where communication with counsel was by means of notes and during breaks).

In the case at hand, the record reveals that the district court was not notified about the defendants' communication problems with counsel until defense counsel first raised the concern during the testimony of the third prosecution witness. When the court was put on notice, it was not an abuse of discretion for the district court to agree with the solution proposed by defense counsel because it fulfilled the purpose of the CIA. The solution ensured that the defendants could communicate with counsel, albeit during breaks in testimony. A district court certainly may decide that the appointment of an additional interpreter would be the preferable solution in a case. But, the plain language of the CIA does not mandate the appointment of an additional interpreter to sit at the defense table. The CIA provides for simultaneous interpretation of the proceedings, not simultaneous interpretation of attorney-client communications. As long as the district court, when put on notice, adopts a solution that removes the inhibition on communication with counsel, we cannot say that the district court abused its discretion.

B. The Fifth and Sixth Amendments to the United States Constitution

The United States Supreme Court has yet to recognize the right to a court-appointed interpreter as a constitutional one. But, in 1907, the Supreme Court stated: "One [claim] is that the court erred in refusing to appoint an interpreter when the defendant was testifying. This is a matter largely resting in the discretion of the trial

court, and it does not appear from the answers made by the witness that there was any abuse of discretion." Perovich v. United States, 205 U.S. 86, 91 (1907). It was not until 1970 that a circuit court held that an indigent criminal defendant who could not speak or understand English was constitutionally entitled to an interpreter. See Negron v. New York, 434 F.2d 386, 387 (2d Cir. 1970). In 1985, our Circuit held in response to a defendant's challenge that the lack of an interpreter denied him due process that "a defendant in a criminal proceeding is denied due process when: (1) what is told to him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to [the defendant] in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact." United States v. Cirrincione, 780 F.2d 620, 634 (7th Cir. 1985). We found that the district court had properly determined that the defendant could understand English and that an interpreter had been made available, but that the defendant did not use the interpreter. See id. at 634. A handful of other cases from various circuits have since also recognized such a constitutional right. See, e.g., United States v. Mayans, 17 F.3d 1174, 1179-81 (9th Cir. 1994) (holding that the defendant's Fifth Amendment rights were violated when interpreter withdrawn by court); Sanchez, 928 F.2d at 1456 (recognizing a constitutional right to an interpreter, but rejecting defendants' Sixth Amendment claim because there was no abuse of discretion); Bennett, 848 F.2d at 1141 (recognizing a constitutional right to an interpreter, but holding that "the court's use of a single interpreter [did not] violate [the defendant's] rights under the sixth amendment"); United States v. Carrion, 488 F.2d 12, 14-15 (1973) (recognizing a constitutional right to an interpreter, but holding that the district court did not abuse its discretion in not appointing one because, in part, defendant and counsel did not explain the problem to the court); Yee Soon Shin, 953 F.2d at 561 (recognizing a constitutional right to an interpreter,

but finding that the district court's appointment of only one interpreter was not an abuse of discretion because defendants did not object). As under the CIA, the appointment of an interpreter as a constitutional matter is within the district court's discretion.

In this case, the defendants' ability to communicate with counsel was effectuated by the interpreter adequately during breaks in the testimony. See, e.g., Joshi, 896 F.2d at 1311 n.8 ("Even if the district court had not acted prudently by appointing a second translator, Joshi's sixth amendment rights would not have been violated if the court had permitted brief recesses to allow client-attorney communications when requested."). The district court never denied any requests for breaks. While we do read the Constitution as ensuring a defendant's right to communicate with his or her counsel, we do not read the Constitution as mandating the appointment of an additional interpreter to sit at the defense table. The solution adopted by the district court to allow the defendants to use the court-appointed interpreter to communicate with their counsel during breaks fulfilled the defendants' right to communicate with counsel. The record reflects that the defendants' communication with counsel was not constitutionally infirm.

II.  Evidentiary Arguments

Salazar, Santa Cruz, and Guzman contend that the district court abused its discretion by allowing into evidence a bank deposit receipt found in the Days Inn hotel room, revealing that Santa Cruz had deposited 34,000 pesos in Salazar's bank account in Mexico in September of 1998, about two months prior to the charged crime. The government sought to admit the receipt as evidence that Santa Cruz and Salazar knew each other prior to engaging in the charged crime. Further, Salazar asserts that the district court abused its discretion by allowing evidence that he had made two prior trips to the same area in Illinois--one in July 1998, where Salazar met Johnson and Holguin at the same Days Inn and the other in September 1998 where Salazar met Johnson at the same hotel. The government sought to admit the evidence to rebut Salazar's contention that he was

approached by a stranger in the hotel and offered money to help unload Mexican candy from a truck into a van. Defendants contend that the receipt was offered to show that the money was from a prior drug transaction and evidence of the trips was offered to show that they were really trips to conduct drug transactions. They say that there was no proof that these pieces of evidence arose from criminal activity, and thus 404(b) was violated because these were neither prior crimes nor prior bad acts.

The district court ruled that evidence of the receipt and the trips was admissible since it was intricately related to the crimes charged and was admissible under 404(b). We review for abuse of discretion. See United States v. Ward, 211 F.3d 356, 362 (7th Cir. 2000).

Generally, evidence of other crimes, wrongs, or acts may be admissible if it satisfies the four-part test developed pursuant to Fed. R. Evid. 404(b). See United States v. Asher, 178 F.3d 486, 492 (7th Cir. 1999). However, evidence of other acts which are intricately related to the facts of the case is admissible without hindrance by Rule 404(b) as long as the Rule 403 balancing test is satisfied. See Ward, 211 F.3d at 362. Evidence may be intricately related if it helps complete the story of the charged crime or tends to prove any element of the crime. See United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000); United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995).

We do not see that this evidence is "evidence of 'other acts' within the meaning of Fed. R. Evid. 404(b)." Ramirez, 45 F.3d at 1102; see United States v. Elder, 16 F.3d 733, 737 (7th Cir. 1994). Defendants correctly state that evidence of uncharged criminal activity is admissible without regard to Rule 404(b) if it is intricately related to the facts of the case, and argue that this evidence was not intricately related because there was no proof that the money deposited or the prior trips were related to any sort of prior drug activity. However, the receipt and evidence of the prior trips were not introduced as evidence of uncharged prior criminal activity. Rather, the evidence served to demonstrate that these men knew each

other well before the charged crime. This evidence was particularly important since they initially disputed knowing one another. To show that these men knew one another and had some form of prior relationship, even if "noncriminal" in nature, was certainly relevant to the story of the case.

Furthermore, the probative value outweighed any prejudice because the evidence rebutted any defense suggestion that these men were unaware of their actions or did not know one another. The defendants argue that the receipt and evidence of the prior trips created an impermissible inference that this evidence was drug-related. We believe that any possibility that such an inference prejudiced defendants was cured by the limiting instruction provided to the jury. The instruction instructed the jury to consider this evidence as only evidence of intent, knowledge, or absence of mistake. "This was not the introduction of evidence concerning acts wholly unrelated to the case which the prohibition of character evidence contained in Fed. R. Evid. 404(b) is designed to prevent." Ramirez, 45 F.3d at 1103.

Therefore, we hold that the district court did not abuse its discretion by admitting this evidence, which, in any event would have been harmless in light of the overwhelming evidence of guilt.

III.  Constructive Amendment to the Indictment

Salazar further argues that the evidence of the prior trips constituted a constructive amendment to the indictment by broadening the scope of the conspiracy charged. See United States v. Cusimano, 148 F.3d 824, 828 (7th Cir. 1998). However, "[t]he introduction of evidence of pre-conspiratorial events does not by itself create a constructive amendment to the indictment." Id. This is particularly true if the evidence is found to be intricately related to the crime charged. See id. (citing United States v. Spaeni, 60 F.3d 313, 316 (7th Cir. 1995)). As Salazar did not raise this contention to the district court, we review it for plain error.

The jurors were given a limiting

instruction as to the prior trip evidence and the time frame of the charged conspiracy was expressly laid out to the jury. With these safeguards in place, we do not believe that the admission of this evidence caused the jury to broaden the scope of the crimes charged in rendering its verdict. Thus, we hold that no plain error occurred.

## IV.  U.S.S.G. sec. 3B1.2

Salazar and Santa Cruz argue that the district court clearly erred by refusing to grant them a sentence reduction under U.S.S.G. sec. 3B1.2,/1 which states: Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group," while a minor participant is one "who is less culpable than most other participants." U.S.S.G. sec. 3B1.2, cmt. n.1, 3. "As we have repeatedly held, the relevant inquiry is whether the defendant was a minor [or minimal] participant in the crime for which he was convicted, not whether he was a minor [or minimal] participant in some broader conspiracy that may have surrounded it." United States v. Brown, 136 F.3d 1176, 1185-86 (7th Cir. 1998) (citing United States v. Burnett, 66 F.3d 137, 140 (7th Cir. 1995)); see United States v. Isienyi, 207 F.3d 390, 392 (7th Cir. 2000); United States v. Neeley, 189 F.3d 670, 684 (7th Cir. 1999); United States v. Griffin, 150 F.3d 778, 787 (7th Cir. 1998). Since determining one's role in the offense is a fact-based inquiry, we review the district court's decision for clear error, which exists when, after reviewing the evidence, we are left with the definite and firm notion that a mistake was made. See United States v. Hunte, 196

F.3d 687, 694 (7th Cir. 1999).

At sentencing, the district court assigned Salazar and Santa Cruz a base offense level of 38 and a criminal history category of I, resulting in a range of 235 to 293 months imprisonment. The court set Salazar's sentence on both Counts 1 and 2 at 235 months, to run concurrently, and Santa Cruz' sentence at 235 months on Count 2. In setting Salazar and Santa Cruz' base offense level, the district court held that each of the defendants had possessed all of the 500 some kilograms of cocaine in the truck. Thus, in denying each defendant a minor or minimal role reduction, the court found that since each had possessed all of the cocaine, nobody was a less culpable player./2 The court expressed that while it believed that none of the defendants were managers, supervisors, organizers, or kingpins, it also believed that none of them were merely minimal or minor participants. See Sentencing Tr. at 28, 47.

"When no conduct of other participants in a criminal scheme is attributed to a defendant for purposes of sentencing, our cases hold that he is not entitled to a sentencing discount because he is a minor or minimal participant in some larger criminal activity of which the conduct for which he is being punished is a part." United States v. Cruz, 233 F.3d 492, 493 (7th Cir. 2000) (citing Almanza, 225 F.3d at 846; United States v. Hamzat, 217 F.3d 494, 497 (7th Cir. 2000); Isienyi, 207 F.3d at 392). Almanza says that a sentencing discount under U.S.S.G. sec. 3B1.2 may be possible if a defendant is charged with and convicted of multiple transactions in a conspiracy and he or she only participated in some of them, but not all, or a reduction may be possible if a defendant is charged in a conspiracy, whether consisting of one or many transactions, and he or she only played a small role (such as a "lookout") in the transaction(s). See 225 F.3d at 847. Defendants argue that this latter possibility applies to them.

Salazar and Santa Cruz contend that the court's decision was clearly erroneous because their role in the offense was small; they were just "cogs in a wheel." Defendants ask that the 500 some kilograms of cocaine be divvied up and

that only the amount of cocaine that they personally unloaded from the truck ought to be attributed to them for sentencing purposes. They argue that they were charged with all of the group's conduct even though they only moved the boxes around in the trailer and only unloaded one box before they were arrested. They point out that they were not involved in driving the truck up from Texas (which was Johnson's job), nor was it their responsibility to drive the van away (which was Guzman's job). They liken their role more like that of the defendant in Hunte. In Hunte we remanded to the district court to enter a sentence reduction for at least minor and possibly minimal participation for a defendant in a drug distribution group who helped hide the group's activities by closing the blinds and registering for a motel room, but who was neither a courier nor a helper in loading and unloading the drugs. See 196 F.3d at 693-94.

But this case is different. We agree with the district court that Salazar and Santa Cruz' roles in the offense were more culpable than they have argued. See United States v. Kerr, 13 F.3d 203, 206 (7th Cir. 1993) (explaining that one who plays a lesser role than others is not necessarily a minor participant). The district court found that all of the defendants exercised total control over all of the cocaine and thus were all equally culpable for it. Furthermore, no additional relevant conduct beyond the drugs involved in this case was attributed to the defendants. After reviewing the record, we find that the district court did not clearly err in denying Salazar and Santa Cruz a mitigating role adjustment.

V.  Anders Brief

Defendant Johnson's appointed appellate attorneys move to withdraw under Anders v. California, 386 U.S. 738 (1967), because they believe that no nonfrivolous issues for appeal exist. Johnson was notified that he could respond to the Anders brief pursuant to Circuit Rule 51(b), but he did not. Since the Anders brief is facially adequate, we review only the issues it raises. See Febus, 218 F.3d at 797 (citing United States v. Tabb, 125 F.3d 583, 584 (7th Cir. 1997)

(per curium)). Counsel considered whether: (1) the district court erred in admitting into evidence prior bad acts, Johnson's affidavit filed at his preliminary hearing, and the government's expert testimony; (2) Johnson was denied a fair trial because he wore a prison jumpsuit throughout the trial; (3) the evidence was sufficient; and (4) any errors in sentencing existed. Upon examination of the record and the law, we find ourselves in full agreement with counsel that these grounds for appeal are frivolous. See id. (quoting United States v. Wagner, 103 F.3d 551, 553 (7th Cir. 1996)). Therefore, we grant counsel's motion to withdraw from the case and dismiss Johnson's appeal.

CONCLUSION

The district court's judgment as to all issues raised is hereby AFFIRMED.

/* Appeal No. 99-3902 was submitted for decision without oral argument.

/1 A joint brief was submitted by Guzman, Santa Cruz, and Salazar, in which they presented a general sketch of the law and a general argument for this sentence reduction. A footnote in the joint brief stated that the "individual arguments of the defendants as to the particular circum- stances which demonstrate their minimal role in the group's conduct will be made in their supple- mental briefs." Only Salazar and Santa Cruz submitted supplemental briefs, which presented specific arguments on this issue. Guzman relied on the generalities in the joint brief, which is not enough because it did not apply the specific facts regarding his involvement in the offense. We will not construct Guzman's argument for him, and thus we hold that his claim under U.S.S.G. sec. 3B1.2 is waived. See DeSilva v. DiLeonardi, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

/2 The district court acknowledged that the jury had acquitted Santa Cruz of the conspiracy charge and only convicted him of possession. Yet, the court said the following to him in denying a reduction: "as to the count with which you were found guilty [possession], you have equal culpability with the other two individuals [Salazar and Guzman]. Therefore, your role in the offense is neutral, resulting in neither an enhancement [for being an organizer] nor a reduction [for being a minor or

minimal participant]." Sentencing Tr. at 47.