**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Pavel LEIVA, Defendant–Appellant.**

No. 15–1930.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 2016.

Decided April 29, 2016.

Greggory R. Walters, Attorney, Office of the United States Attorney, Peoria, IL, for Plaintiff–Appellee.

Johanna M. Christiansen, Attorney, Office of the Federal Public Defender, Peoria, IL, for Defendant–Appellant.

Before WOOD, Chief Judge, and BAUER and HAMILTON, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant, Pavel Leiva, appeals his conviction for conspiracy to possess and use counterfeit credit cards with intent to defraud in violation of 18 U.S.C. §§ 1029(a)(1), 1029(a)(3), and 1029(b)(2), and possession of fifteen or more counterfeit credit cards with intent to defraud in violation of 18 U.S.C. § 1029(a)(3). Leiva's first two arguments stem from translation issues that arose during both a traffic stop that resulted in a search of Leiva's car and his subsequent trial.

Leiva, a Florida resident who is from Cuba and only speaks Spanish, contends that the translation issues led to an unauthorized search of his car. This search yielded the majority of the physical evidence used against him at trial. He also contends that translation issues with the interpreter during his trial testimony violated both his due process rights and the Court Interpreter's Act, 28 U.S.C. § 1827 (the "CIA"). Leiva's final argument is that the district court did not make sufficient findings of fact to support the imposition of supervised release. We reject all three arguments and affirm Leiva's conviction and sentence.

## I. BACKGROUND

Leiva, Amberly Martin, and Paola Gallego hatched a scheme: Leiva would supply Martin and Gallego with fraudulent credit cards and the women would use the cards to purchase merchandise. On June 21, 2013, the three flew from Miami, Florida to Milwaukee, Wisconsin to execute their plan. Upon arriving in Milwaukee, Leiva rented a white Hyundai Elantra, and proceeded to chauffeur Martin and Gallego around Wisconsin and Illinois. From June 22 through June 26, the women, operating under the names "Geena Rose" and "Sandra Vega," engaged in a spending spree at various stores using the cards that Leiva had provided. The women bought cell phones, iPad minis, and gift cards, as well as personal items for themselves such as women's shoes, purses, and wallets. On June 26, the three were driving on Interstate 55 through Springfield, Illinois, destined for St. Louis, Missouri.

### A. The Traffic Stop

Illinois State Trooper Dustin Weiss was on duty that day, parked in an unmarked patrol car in the median of the highway. He saw the white Hyundai Elantra pass him, slow down below the posted speed limit, and shift from the center lane to the right lane. Weiss observed the driver of the car attempt to hide himself as he changed lanes. Wanting to investigate further, Weiss pulled into traffic behind the Elantra. He then observed the driver move around within the car, and saw the car swerve onto the shoulder of the highway and then swerve back into the right lane. Weiss pulled over the car for improper lane use, and parked his patrol car twenty to twenty-five feet behind the Elantra.

While in his patrol car, Weiss conducted a check on the license plate and found that the Elantra was a rental. He exited his car and approached the Elantra on the passenger side. When he reached the Elantra, he identified himself, explained why he had pulled over the car, and asked some initial questions. Leiva did not respond to Weiss' questions; instead, he handed Weiss his driver's license and rental car agreement. Leiva also said something in Spanish to Gallego, who was in the front passenger seat. Gallego told Weiss that Leiva did not speak English. Weiss, who does not speak Spanish, asked Gallego to explain to Leiva why he had stopped the car, and that he was only going to issue Leiva a warning.

Weiss then returned to his patrol car to perform computer checks on the car and Leiva. After running the checks, Weiss used his loudspeaker to ask, "Can you have the driver come back to my vehicle?" Leiva exited the Elantra, walked to Weiss' patrol car, opened the front passenger door, and sat in the front passenger seat. Martin and Gallego remained in the Elantra.

In the patrol car, Weiss again attempted to communicate with Leiva, but Leiva did not respond. Weiss noticed that the carotid artery in Leiva's neck was beating at a fast rate, his forehead was sweaty, his stomach was visibly pulsating, and his

hands were shaking. When Leiva did not respond, Weiss obtained some prepared Spanish translations of questions that were on a sheet in the patrol car. He asked Leiva about his travels. After this questioning, Weiss went to the Elantra, and spoke with Gallego about the trip. When he returned to the patrol car, Weiss completed a written warning for Leiva, and had Leiva sign it. Weiss handed Leiva the warning, the rental agreement, and Leiva's license. Weiss then entered the phrase "You are free to go" into the iTranslate application on his iPhone, and read the translated Spanish to Leiva.

As Leiva began to exit the patrol car, Weiss said, "Un momento," and asked in English if he could speak with Leiva further. Leiva did not respond; he only stopped and looked at Weiss. Weiss asked, "Puedo buscar su coche?" which Weiss believed meant, "May I search your car?" Leiva said, "Yes," in English, nodded, and then said, "Sí." Weiss asked, "Sí?" and Leiva again said, "Sí."

By this time, other state troopers had arrived on the scene, as had state police agents. Weiss searched the Elantra with their assistance. Leiva stood by the patrol car unrestrained during the search. In the car, the officers found 65 fraudulent credit cards, five iPad minis, women's purses, mail and store receipts, and five Walmart gift cards. They also found four typewritten pages containing credit card numbers, expiration dates, and the names and addresses of the actual cardholders. Gallego later testified that these were probably Leiva's notes.

1. The government additionally argues that, had Weiss used the iTranslate application for translation, the application would have translated "May I search your car?" as "Puedo buscar su coche?" The government thus argues that Weiss acted in good faith, and that

**B. The Suppression Hearing**

Leiva, Martin, and Gallego were indicted for both conspiracy to possess and use counterfeit credit cards with intent to defraud and possession of at least fifteen counterfeit credit cards with intent to defraud. Martin and Gallego pleaded guilty, but Leiva went to trial. Both Martin and Gallego testified for the prosecution at Leiva's trial.

Leiva moved to suppress the evidence confiscated during the search of the Elantra. Weiss testified at the suppression hearing, as did Martin and Gallego. Notably, Leiva offered no contradiction of Weiss' account. When cross-examined, Weiss admitted that he did not ask either Gallego or Martin to translate regarding consent to search. He also testified that he did not ask any other officer to help him with his Spanish and that he did not use the iTranslate application to get the phrase, "Puedo buscar su coche?"[1]

At the hearing, Martin and Gallego testified that Leiva was the ringleader of the scheme. As the magistrate judge noted, the two women testified that Leiva "supervised" them, "told them what to buy[,] and watched them as they did so." Further, Leiva stored the stolen goods in the trunk of the Elantra and forbade the women from opening the trunk without his permission. He also stored the stolen cards in the glove box. The women further testified that when Weiss pulled over the Elantra, Leiva told them to give him the fake driver's licenses that he had made for them. He also instructed Gallego to get the rental agreement from the glove box and told both women to say nothing.

the search was valid under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its progeny. But because, as detailed below, we hold that Leiva consented to the search of his car, we do not address this good faith argument.

Leiva called three expert witnesses who stated that "Puedo buscar su coche?" does not mean, "Can I search your car?" All three witnesses stated that "Puedo buscar su coche?" means "May I *look for* your car?", "May I *get* your car?", or "May I *locate* your car?" It does not indicate a question regarding a search of the interior of the car. Rather, the proper phrase for "May I search [the interior of] your car?" would be "Puedo *revisar* su *carro*?" or "Puedo *registrar* su carro?" One expert testified that if Weiss had said, "Puedo buscar *en* su coche?", a native Spanish speaker may have understood the phrase to mean "May I search *inside* your car?"

Although determining that Weiss' Spanish phrase was not properly phrased, the magistrate judge still found that Leiva had consented to the search and that both the search and subsequent seizure of evidence in the car were proper, and recommended that the district court deny Leiva's motion to suppress. The district court adopted the recommendation and denied the motion to suppress.

## C. The Trial

At trial, Leiva contested Martin's and Gallego's story that he had coordinated the operation. Instead, he claimed that he was a patsy who had no knowledge of the women's scheme. He claimed that Martin and Gallego only spoke English to one another and that, because he only speaks Spanish, he did not understand what they were doing. He was therefore unwittingly ensnared in their fraud conspiracy. He denied knowing that the cards were counterfeit and that any items were purchased illegally, and he denied recruiting the women, coordinating the scheme, and directing them in any way. Martin and Gallego testified, as they had at the suppression hearing, that Leiva had indeed coordinated everything.

Leiva testified on the fifth day of his trial, with the aid of two interpreters. His defense counsel told him to raise his hand while testifying if he had difficulty understanding any questions. He says that he had no difficulties with the first interpreter, who translated for him in the morning. By contrast, he notes multiple problems with the second interpreter, who began translating after the lunch break. This interpreter had also translated on the second, third, and fourth days of the trial. There are various moments where difficulty with translation arose. For example, during direct testimony, Leiva was asked about a video of one of the retail transactions, and the following exchange occurred:

Q. Do you see . . . yourself in this video?

A. Yes.

Q. Okay. What are you wearing?

THE INTERPRETER: Sorry. He said "the telephone" and said[,] "[W]hat are you wearing[?]"

Q. Okay.

THE INTERPRETER: And he said[,] "[S]orry about that." He didn't understand that question.

Q. Okay. What are you wearing?

THE INTERPRETER: He says white pull-over. And he's saying something that I don't—pants.

Q. Okay. . . .

So what are you doing right here? Do you remember?

THE INTERPRETER: He's with his cellular. He says, "I'm with my cellular. I'm using my cellular."

Q. Okay. You're using your phone?

THE INTERPRETER: He's just looking.

A. I'm just looking what's in there.

Other translation issues occurred, including when the interpreter summarized

Leiva's words as opposed to giving a simultaneous, verbatim translation. Defense counsel requested and the court granted a sidebar, where the following colloquy occurred:

[DEFENSE COUNSEL]: Your Honor, this is not working very well. I don't know that she's translating correctly, or—it just seems a lot rougher than this morning.

[DEFENSE CO–COUNSEL]: It doesn't seem to be a real-time translation. It seems to be more of like listening to blocks of what he says and then paraphrasing what he says. As opposed to this morning where the interpreter was interpreting his actual words in real-time.

I don't know how we can do that here, other than maybe to go very slowly and ask the interpreter to interpret his actual words.

THE COURT: Okay. You're going to have to be very close and you have to make them short. And then get the translation. Don't run into [a] long, rambling preamble. It's got to be precise.

[DEFENSE COUNSEL]: Okay.

[DEFENSE CO–COUNSEL]: Could the Court instruct her to interpret his actual words?

THE COURT: Do you have a problem with that?

[GOVERNMENT COUNSEL]: No, Judge.

THE COURT: Okay.

. . .

So let's keep our questions short so that the answer can be short.

And Ms. [Interpreter], please translate exactly what he is saying, as well as the question.

THE INTERPRETER: Yes, Your Honor, I will.

THE COURT: So it is crisp and clear; each one.

THE INTERPRETER: Yes, Your Honor.

The government later objected that defense counsel was asking leading questions on direct examination. The following colloquy occurred:

[DEFENSE COUNSEL]: I'm trying, Judge.

THE COURT: Well, this is difficult, [government counsel].

[GOVERNMENT COUNSEL]: I understand, Your Honor.

THE COURT: We're involving two languages here. And it is quite difficult. So we'll do the best we can. And I think that [defense counsel] is trying to do exactly that.

Let's take it slow.

Direct examination continued without further issue. During cross-examination, Leiva raised his hand, denoting that he did not understand the question. His counsel requested a sidebar, which the court granted.

[DEFENSE COUNSEL]: We had asked Mr. Leiva to raise his hand if he had a problem with understanding what the interpreter said. He's raising his hand now. So . . . I don't know how we can address that.

THE COURT: . . . [W]hy don't we re-ask the question. You want the Court Reporter to do it[?]

[GOVERNMENT COUNSEL]: Your Honor, I can withdraw that question. . . . [T]his might be a good time to straighten out the problem with his understanding of the interpreter. I don't know if that's just one question or whether it's a long-standing problem, but perhaps we could find out. Because I notice that there is delay sometimes with the questions I ask. I'm trying to be as short—

THE COURT: You're doing a good job.

[GOVERNMENT COUNSEL]: —and the response, because he just keeps ... talking. It's not really the interpreter's fault.

THE COURT: I know, I know. But these things are very difficult, if you're not having this stuff coming in every case.... Why don't we take a break and perhaps you can have a chat, both you and the Court Reporter. And find out if he's getting this ... interpretation. If he understands it.

The court and counsel noted that the current interpreter was from Guatemala, and was having trouble understanding Leiva's Cuban dialect. By contrast, the interpreter from the morning, who was Venezuelan, "kn[ew] the Cuban dialect very well." But Leiva himself seemed to exacerbate the problem by rambling often:

[GOVERNMENT COUNSEL]: ... I think the problem is more with him talking continuously and her trying to interpret.... I'm trying to ask questions that would elicit a yes/no, yes/no.

THE COURT: Slow and short.

[DEFENSE COUNSEL]: Would it be improper for us to tell [Leiva] to shorten his answers? Is that proper?

THE COURT: I think it would be fine if you did that.

[DEFENSE COUNSEL]: Or at least if he's going to give a long answer, she should interpret parts of it.

THE COURT: Okay. Let's ... take a break and you can talk to her about that.

During the break, defense counsel consulted with Leiva. Before the jury returned from their break, Leiva's counsel relayed the discussion to the district court.

[DEFENSE COUNSEL]: I spoke with Mr. Leiva and he does have concerns with the interpretation. But I did explain two things. That if he did not understand something, to say, "I don't understand." And I told him not to answer a question that he did not understand.

And then I also told him that ... his answers need to be interpreted in blocks. And so that he does not—

THE COURT: Ramble.

[DEFENSE COUNSEL]: Ramble, okay. So hopefully we'll be okay.

THE COURT: All right.

Defense counsel then cited § 1827(d)(2) of the CIA, which allows the district court to require, upon motion, that the proceedings be recorded. Defense counsel stated, "And my understanding is that's being done. And so I would just ask that [the recording] continues to be done, so that if there are any issues with interpretation, it's being recorded and there's a permanent record of it." Defense counsel then asked the court if this request made sense. The court responded affirmatively, "Oh yes, it makes a great deal of sense. And perfectly good sense."

The court, the court clerk, and the parties then determined how to optimize the sound for the recording. The court instructed the interpreter to use a handheld microphone, while Leiva would use the microphone affixed to the witness stand. Cross-examination, re-direct examination, and re-cross-examination followed without further interruption.

The jury convicted Leiva of both conspiracy to commit credit card fraud and possessing counterfeit credit cards. From the conclusion of his testimony until the jury reached its verdict, Leiva raised no concerns about the translation with the court.

### D. The Sentence

On April 10, 2015, the district court sentenced Leiva to concurrent sentences of 60 and 82 months in prison for counts one and two of his conviction. It also imposed two

years of supervised release upon completing the prison term, but added that if Leiva paid the calculated $3,797.48 loss as restitution within one year, supervised release would end early. Leiva argued against supervised release, saying that he had complied with all of the conditions of pre-trial release. The district court rejected this argument, reasoning that "many defendants abide by such conditions," and that "supervised release is still imposed at sentencing in the overwhelming majority of those cases."

In pronouncing its sentence, the district court explained its rationale. It recognized Leiva's lack of a criminal history as a mitigating factor. However, Leiva's failure to accept responsibility for his actions—as Martin and Gallego had done— was an aggravating factor for the court, as was his willingness to lie about his involvement with the scheme while testifying. The district court noted that had Leiva cooperated, the court "perhaps ... would have weighed that factor very heavily." The district court stated that while Leiva has elderly parents and multiple children for whom he is responsible, these familial considerations were not "extraordinary factor[s] which warrant [ ] a sentence reduction in this case." Leiva's crime, in the district court's words, was "serious": it was part of a "very sophisticated scheme" that "put significant amounts of credit at risk." Leiva "recruited and supervised" Martin and Gallego and "never accepted responsibility." As a result, the court refused to lower his sentence based on family considerations.

In imposing supervised release specifically, the district court discussed Leiva's lack of a criminal history, as well as the need to provide restitution: "You don't have any criminal history, Mr. Leiva, so if you pay your restitution obligation within one year, I'll let you off early. One year;

you won't have to serve that second year of supervised release."

## II. DISCUSSION

On appeal, Leiva first argues that he did not consent to the search of his car and that the district court erred by not suppressing the evidence seized during this search. Second, he argues that the district court violated both his constitutional right to testify as well as the CIA by failing to replace the interpreter during the afternoon portion of his testimony. Finally, he argues that the district court did not sufficiently explain its reasoning for imposing supervised release. We disagree with all three arguments.

### A. Motion to Suppress Properly Denied

 First, the district court did not err in finding that Leiva had voluntarily consented to the search of the Elantra and denying Leiva's motion to suppress. Determining whether a person has consented to a search by law enforcement is a finding of fact, and we review the district court's findings of fact for clear error. *See United States v. Gonzalez–Ruiz*, 794 F.3d 832, 835 (7th Cir.2015) (citation omitted); *see also United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir.2015) (when reviewing order regarding motion to suppress, this court "review[s] the district court's factual determinations for clear error" (citation omitted)). Here, the findings of the magistrate judge and the district court were not clearly erroneous.

 A police officer may search an automobile without a warrant if "there is probable cause to believe it contains evidence of criminal activity," if there is reasonable suspicion that an occupant of the car possesses or the car itself contains accessible weapons, or if the occupant of the car consents to the search. *United*

States v. Charles, 801 F.3d 855, 860 (7th Cir.2015) (citing Arizona v. Gant, 556 U.S. 332, 347, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009)) (probable cause is an exception to warrant requirement); see also Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (reasonable suspicion sufficient to search person for weapons); Michigan v. Long, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (reasonable suspicion sufficient to search car for weapons); Schneckloth v. Busta-monte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent"). Here, Leiva's consent is particularly important, because Weiss did not have either probable cause or reasonable suspicion to search Leiva's car.

Leiva does not challenge that Weiss had probable cause to believe that Leiva had committed a traffic violation, specifically improper lane use. See 625 ILCS 5/11-709(a) (detailing improper "[d]riving on roadways laned for traffic"). But Weiss did not articulate sufficient facts that establish reasonable suspicion for anything beyond the traffic violation. See United States v. Riney, 742 F.3d 785, 788 (7th Cir.2014) (citing Terry, 392 U.S. at 30, 88 S.Ct. 1868) (reasonable suspicion must be "based on articulable facts that a crime is about to be or has been committed" (quotation marks and other citations omitted)). Without such facts, he cannot demonstrate reasonable suspicion to search Leiva's car, and also cannot meet the higher standard of probable cause. See Florida v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (citation omitted) (probable cause is higher standard than reasonable suspicion); United States v. Brown, 366 F.3d 456, 458 (7th Cir.2004) (citation omitted).

Weiss claimed that Leiva's apparent nervousness created reasonable suspicion; Weiss noted that the carotid artery in Leiva's neck was beating at a fast rate, that Leiva's forehead was sweaty, that his stomach was pulsating, and that his hands were shaking. But we and other circuits have held that nervousness alone is insufficient to support a finding of probable cause or reasonable suspicion. See Huff v. Reichert, 744 F.3d 999, 1007 n. 3 (7th Cir.2014); United States v. Brown, 188 F.3d 860, 865 (7th Cir.1999). Yet consent trumps a lack of reasonable suspicion or probable cause, and allows for a valid search without a warrant. See Schneckloth, 412 U.S. at 219, 93 S.Ct. 2041; Vinson v. Vermilion County, Illinois, 776 F.3d 924, 929 (7th Cir.2015). We determine consent to search by assessing the totality of the circumstances. See United States v. Drayton, 536 U.S. 194, 206–07, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (citing Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041, and Ohio v. Robinette, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)); United States v. Rahman, 805 F.3d 822, 832 (7th Cir.2015) (citations omitted).

Even accepting that Weiss' Spanish question does not mean exactly what he intended, the district court was not clearly erroneous in finding that based on the totality of the circumstances Leiva voluntarily consented to the search. The magistrate judge found that, as in similar consent to search cases, "it was clear that the officer did not need to search for or locate the car. Rather, it was clear that the officer was asking permission to search the car." The magistrate judge determined that "Leiva understood that Weiss was asking permission to take an action with respect to the Hyundai [Elantra]," because Leiva responded to Weiss' question "without hesitation" and did not seem "boggled by the question as nonsensical."

In accepting the recommendation of the magistrate judge, the district court also cited Leiva's immediate response to Weiss and his lack of confusion at the question. It further stated that it would be unreasonable for Leiva to think that Weiss wanted to find or locate Leiva's car: "Because the rental car had not been moved since the traffic stop, there was no reason for the officer to ask the Defendant if he could 'locate' or 'look for' a car that was 20 to 25 feet away from them." The district court also noted that Leiva's actions towards Martin and Gallego—telling them to give him their fake licenses and to be quiet—"suggest[ed] that [Leiva] was afraid that evidence of illegal activity might be discovered if a search was conducted." These actions indicated to the district court that Weiss had asked for consent to search Leiva's car and Leiva had given consent to search.

Based on the totality of circumstances as found in the record, we see nothing that compels the finding of consent clearly erroneous.

### B. Translation Issues

Second, the district court did not err by not replacing the Spanish interpreter employed during the afternoon of Leiva's trial testimony. Leiva argues that the court's failure to do so violated his right to testify under the Due Process clause and his rights under the CIA. We find that the translation was competent and did not violate Leiva's due process, and that the circumstances did not mandate the replacement of the afternoon interpreter.

### 1. Distinction Between Due Process Claim and CIA Claim

■ Before analyzing the facts, we bifurcate Leiva's overall argument into a constitutional claim and a statutory claim. As a threshold matter, we note that Leiva had a constitutional right to competent translation of his testimony at trial. A criminal defendant has the constitutional due process right to testify on his behalf. *See Rock v. Arkansas,* 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Starkweather v. Smith,* 574 F.3d 399, 403 (7th Cir.2009). Further, we have noted that "[a] criminal defendant is denied due process when he is unable to understand the proceedings due to a language difficulty." *Mendoza v. United States,* 755 F.3d 821, 827 (7th Cir.2014) (citing *United States v. Johnson,* 248 F.3d 655, 663 (7th Cir.2001), and *United States v. Cirrincione,* 780 F.2d 620, 634 (7th Cir.1985)).

■ Indeed, the reciprocal of *Mendoza* is true: a defendant has the due process right *to be understood* at trial. *See Johnson,* 248 F.3d at 663; *Cirrincione,* 780 F.2d at 634. The CIA is a prophylactic statutory measure designed to protect a criminal defendant's due process right to testify and to have his testimony competently translated. The CIA's purpose is "to ensure that the defendant can comprehend the proceedings and communicate effectively with counsel." *United States v. Febus,* 218 F.3d 784, 791 (7th Cir.2000) (citation omitted). It also ensures that the defendant's testimony is effectively translated, so that he may be understood.

■ We separately analyze Leiva's constitutional due process claim and his statutory CIA claim. First, each claim has a slightly different focus of review: the due process claim focuses on the translation itself; the CIA claim focuses on the court's actions or omissions regarding the interpreter and her ability to translate. Second, each claim has a different standard of review. Leiva's due process claim deals with a constitutional right that we review *de novo. See United States v. Lee,* 795 F.3d 682, 685 (7th Cir.2015) ("constitutional arguments ... receive *de novo* review" (citation omitted)). We review the CIA claim—specifically the district court's

unwillingness to replace the interpreter—for abuse of discretion. *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir.2003) (citing *Johnson*, 248 F.3d at 661). The district court did not err in regard to either issue.

### 2. Due Process Claim

 First, the district court did not violate Leiva's due process right to a competent translation of his testimony. A district court denies a criminal defendant due process where "the accuracy and scope of a translation at a hearing or trial is subject to grave doubt." *Cirrincione*, 780 F.2d at 634; *see also United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir.1990) (the "basic constitutional inquiry" when determining competency of translation is "whether any inadequacy in the interpretation made the trial fundamentally unfair" (quotation marks and citations omitted)). Here, while the transcript evidences hiccups in the interpreter's translation of Leiva's testimony, the overall translation does not create such grave doubt as to render Leiva's trial unfair.

Leiva's theory at trial was that Martin and Gallego devised the scheme, and that he was ignorant of their plan. He testified to this effect, saying that, for example, the two women only spoke about their plan in English to one another and that he could not understand these conversations. Simply put, he claimed that he did not know what they were doing. Leiva testified that he did not plan the scheme, had no intent to be involved with any wrongdoing, and did not know that he was an accomplice to Martin's and Gallego's fraud. He also denied recruiting the women, denied coordinating the scheme, and denied directing them in any way. All of these contentions are clear from the transcript of his testimony.

Leiva's due process right to competent translation is a right to have an interpreter accurately convey his story. The translation of his testimony conveyed his story.

### 3. CIA Claim

 While the translation passes constitutional muster, a closer question is whether the district court abused its discretion by not replacing the afternoon interpreter. District courts have "wide discretion in implementing the Court Interpreter's Act." *Sandoval*, 347 F.3d at 632 (citation omitted). We are deferential; any preference of the appellate court is not binding. *See United States v. Abair*, 746 F.3d 260, 269 (7th Cir.2014) (appellate review of evidentiary rulings "is deferential; we only look for an abuse of discretion" (citations omitted)).

 We review to ensure that the district court's actions enabled Leiva's testimony to be understood. *See Mendoza*, 755 F.3d at 827; *Johnson*, 248 F.3d at 663; *Febus*, 218 F.3d at 791; *Cirrincione*, 780 F.2d at 634. Here, the district court took every action short of replacing the interpreter to ensure that the jury understood Leiva's testimony.

Examples abound of the district court's attentiveness to the concerns that the situation presented. First, when defense counsel complained at sidebar that the interpreter was summarizing and paraphrasing Leiva's testimony rather than providing a simultaneous translation, the court emphasized succinctness and precision in counsel's questions: "You're going to have to be very close and you have to make them short. And then get the translation. Don't run into [a] long, rambling preamble. It's got to be precise." Additionally, the court instructed the interpreter to be precise as well, telling her to "translate exactly what he is saying, as well as the question," and to make the translation "crisp and clear; each one."

Second, when government counsel complained that defense counsel was asking Leiva leading questions on direct examination, the district court noted the difficulty of the situation: "We're involving two languages here. And it is quite difficult. So we'll do the best we can." The district court noted that defense counsel was "trying to do" his best, yet further admonished defense counsel to "take it slow."

Third, the district court encouraged collaboration between the parties. During cross-examination, when Leiva raised his hand to indicate that he did not understand what the interpreter was saying, the district court convened a sidebar to address the problem. Defense counsel stated that Leiva did not understand the question. The court advised the government to re-ask the question; the government instead withdrew the question and noted that "this might be a good time to straighten out the problem with his understanding of the interpreter."

After the break, defense counsel reported that he had explained two things to Leiva: first, "if he did not understand something, to say, 'I don't understand'"; and second, to not answer any questions that he did not understand. Counsel also reported that he had advised Leiva not to ramble. Such actions exemplify the collaboration between both sides that the district court encouraged and facilitated.

Fourth, the district court reiterated the importance of the recording of the proceedings, and made efforts to optimize the recording. Defense counsel noted that Leiva was entitled to a recording under § 1827(d)(2) of the CIA. Counsel knew that the proceedings were already being recorded, and asked that the recording continue, "so that if there are any issues with interpretation, it's being recorded and there's a permanent record of it." The district court stated that this request made "a great deal of sense," and instructed the interpreter to use the handheld microphone while Leiva used the microphone on the witness stand. Importantly, Leiva and his counsel had access to the recording and raised no issues with the translation after Leiva's testimony.

These examples demonstrate multiple laudable actions of the district court: it attended to the concerns of counsel; it encouraged patience; it admonished Leiva not to ramble and the interpreter to translate in real time; it encouraged counsel to ask short, simple questions; it paused when necessary to ensure that Leiva understood the translation; it ensured that the testimony was recorded; and it arranged the courtroom to optimize sound clarity. The district court responded practically to each issue that arose, and collaborated with counsel to make the best of a less than ideal situation. Further, as noted above, the translation itself is clear. In light of the district court's many precautions and the ultimate translation produced, not removing and replacing the interpreter was not an abuse of discretion.

## C. Supervised Release Properly Imposed

██ Finally, Leiva argues that the district court's explanation for imposing supervised release was insufficient. Specifically, he argues that the district court committed procedural error by only making one finding of fact pertaining to supervised release: that Leiva's compliance with the conditions of pre-trial release did not prevent imposing supervised release. He argues that such procedural error mandates remand for resentencing. This argument, however, views the district court's explanation too narrowly.

██ Supervised release is part of the overall sentence. *See* 18 U.S.C. § 3583(a) ("The court, in imposing a sentence of imprisonment ... may include *as*

*part of the sentence* a requirement that the defendant be placed on a term of supervised release" (emphasis added)); *United States v. Thompson,* 777 F.3d 368, 373 (7th Cir.2015) (Section 3583 "dispel[s] ... [a]ny doubt that conditions of supervised release are a part of the sentence"). As part of the sentence, the district court "must justify the conditions [of supervised release] ... at sentencing by an adequate statement of reasons." *United States v. Kappes,* 782 F.3d 828, 845 (7th Cir.2015) (citations omitted). Failure to "adequately explain" a sentence is procedural error "that may require remand." *United States v. Poulin,* 745 F.3d 796, 800 (7th Cir.2014) (citations omitted). We review such procedural errors *de novo.* *E.g.,* *United States v. Grzegorczyk,* 800 F.3d 402, 405 (7th Cir.2015) (citing *United States v. Castro–Alvarado,* 755 F.3d 472, 475 (7th Cir.2014)). In our review, we analyze "the judge's comments at the *entire* sentencing hearing." *Kappes,* 782 F.3d at 859.

The sentencing court's explanation of the sentence must be "reasonably related to the applicable [18 U.S.C.] § 3553(a) factors." *Id.* at 845 (citation omitted). However, this explanation "need not be exhaustive." *United States v. Warner,* 792 F.3d 847, 855 (7th Cir.2015). The sentencing court only needs to engage in a single overall discussion of the § 3553(a) factors that relates to the entire sentence. *See United States v. Sanchez,* 814 F.3d 844, 849 (7th Cir.2016); *United States v. Eads,* 729 F.3d 769, 781–82 (7th Cir.2013). The district court "must still explain" why it is imposing supervised release and may only "address[] ... a single § 3553(a) factor," but "it need not engage in a repetitive rigorous discussion of the § 3553(a) factors." *Sanchez,* 814 F.3d at 849.

Under these parameters, the district court's explanation for imposing supervised release in this case was sufficient.

In discussing the sentence as a whole, the district court noted Leiva's lack of a criminal history, deeming it a mitigating factor. It deemed as aggravating factors his failure to accept responsibility for his crimes and his willingness to lie on the witness stand. It discussed Leiva's family considerations, but did not consider these "extraordinary factor[s] which warrant [ ] a sentence reduction." Leiva's crime, his leadership role in the scheme, and his unwillingness to accept responsibility superseded his family considerations in the district court's view.

Regarding supervised release specifically, the district court restated Leiva's lack of a criminal history, but also noted the need to make restitution. Both are § 3553(a) factors. *See* 18 U.S.C. §§ 3553(a)(1); 3553(a)(7). It also rejected Leiva's argument that his comportment with conditions of pre-trial release reduced the need for supervised release. The district court's explanation for imposing supervised release was brief, but succinct; it adequately related the need for supervised release to § 3553(a) factors. Particularly in the context of the entire pronouncement at the sentencing hearing—which discussed other § 3553(a) factors—the district court's explanation for supervised release was sufficient.

## III. CONCLUSION

We AFFIRM Leiva's conviction and sentence.